Robert KIEFER, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 44S03–0201–CR–11.

Supreme Court of Indiana.

Jan. 4, 2002.

Jeffrey W. Wible, LaGrange, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Robert Kiefer appeals his conviction for attempted murder and argues that insufficient evidence supported the jury's verdict. Because the State failed to prove that

Kiefer had the specific intent to commit murder, we reverse.

## Facts and Procedural History

On the evening of September 8, 1999, fourteen-year-old Chris Meringa was walking down County Road 750 North to his home in Shipshewana. As he passed Robert Kiefer's house, Meringa heard an "explosion type noise." (R. at 201–02.) Unaware that a gun had been fired, but startled by the sound, Meringa turned and looked quickly in the direction of Kiefer's residence. Meringa saw "[l]ots of black smoke" and sprinted home. (*Id.*)

The State charged Kiefer with attempted murder. A jury found Kiefer guilty, and the court sentenced him to twenty-two years in prison.

Kiefer appealed his conviction. The Court of Appeals affirmed, holding that the instruction on attempted murder was not erroneous and that there was sufficient evidence to convict Kiefer. *Kiefer v. State*, slip op. at 5–6, 747 N.E.2d 82 (Ind.Ct.App. 2001). We now grant transfer and reverse.

## The Evidence on Attempted Murder

Kiefer contends that the State failed to produce sufficient evidence to convict him of attempted murder. We have closely scrutinized the record and conclude that the State did not meet its burden of proving that Kiefer intended to kill Meringa.[1]

■ In reviewing sufficiency claims, we will not invade the province of the jury and reweigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict, and we will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty be-

yond a reasonable doubt. *Taylor v. State*, 681 N.E.2d 1105, 1110 (Ind.1997).

The State presented the testimony of five eyewitnesses: Chris Meringa, Kiefer's two grandchildren, and two other neighborhood children. (R. at 199, 214, 227, 233, 245.) Meringa was walking on the roadway roughly thirty feet from Kiefer, (R. at 206), and the other four minors were standing near Kiefer when he fired the gun. (R. at 238.) The jury also heard evidence from three police officers and from Meringa's brother-in-law. (R. at 256, 270, 283, 288.)

Meringa first testified that as he was walking by Kiefer's home, he heard an explosion. (R. at 202.) Looking back and seeing a plume of black smoke, he sprinted home. (*Id.*) Meringa did not know a gunshot had been fired until after he got home, when Kiefer's grandson Travis arrived. (R. at 203.) Although Kiefer and Meringa lived in the same neighborhood, Meringa testified that he had never spoken with Kiefer, had never been to his home, and had never had any problems with him in the past. (R. at 204–05.) Asked if he was accusing Kiefer of firing at him, Meringa said "No." (R. at 209.)

David Weirich, Jr., a twelve-year-old neighbor of Kiefer's, testified next. (R. at 214–16.) David and his brother Cain had gone to Kiefer's to retrieve their father's loaned air compressor. (R. at 216–17.) David testified:

Q: So let me ask you again, did Mr. Kiefer say anything before he shot at Chris Meringa?

A: Yes he did.

Q: O.K., now what did he say?

A: He said who is that. We told him Chris and [Kiefer] asked if he, if we, liked him and I said yeah, he's O.K.

---

1. In light of this conclusion, we do not address Kiefer's complaint about the adequacy of the instruction on attempted murder. (Appellant's Br. at 4–9.)

and he brought up the gun and shot.

Q: Where was ah, where was Chris when Mr. Kiefer shot at him?

A: Pas[t] a bush. A bush by the corner of the fence by the road.

(R. at 219.) On cross-examination, David clarified that Kiefer shot at the bush, not at Meringa. (R. at 226.)

Cain Mullins, David Weirich's thirteen-year-old brother, was next on the stand. (R. at 217, 228.) Cain stated that as Chris was walking by, Kiefer "shot at him." (R. at 230.) Cain testified that after Kiefer fired the gun Kiefer said, "That kid must be scared now." (R. at 231.)

Travis Kiefer, Kiefer's seventeen-year-old grandson, testified next. (R. at 233.) Travis lived with Kiefer. (*Id.*) Travis testified that Kiefer was holding the gun because the two of them had been target shooting in the backyard, (R. at 235), and that Kiefer was an experienced and accurate marksman. (R. at 237–38.) The following exchange occurred:

Q: What happened then?

A: We were outside, I was working on my bike. Cain was talking to my grandpa about the air compressor. I was talking to them. My grandfather had the 44 black powder pistol. Chris Meringa walked by. My grandfather asked who that was. We all told him it was Chris and then my grandpa pulled up the gun and fired it.

Q: O.K. And ah, after he fired the gun what ah, did he say anything?

A: He said he might be scared.

Q: Your grandfather said that?

A: Yes.

(R. at 238–39.) On cross-examination, Travis testified that the gun had four rounds remaining after the gunshot in question. (R. at 242.) Travis further stated that Kiefer "could have been firing at the bush or he could have been firing at the trash box right beside the bush." (R. at 241.) Travis concluded by testifying that Kiefer turned and walked casually back into the house after firing the gun. (R. at 242.)

The final eyewitness to testify was Heather Goodwin, Kiefer's seventeen-year-old granddaughter. (R. at 245–46.) She too lived in her grandfather's home. (R. at 246.) Heather testified that Kiefer asked whom the person was walking down the road and then fired at a bush. (R. at 247.) After the police arrived on the scene, Heather gave a statement that her grandfather had been "moody—worse than a pregnant lady" and "fine one minute and the next minute . . . really mad and yelling about everything." (R. at 249.)

Sergeant Terry Martin of the LaGrange County Sheriff's Department testified next. (R. at 256–57.) Martin was a neighbor of Kiefer's and was the first to respond to the incident. (R. at 258–60.) Martin testified that Heather Goodwin reported the shooting, (R. at 258), and he described Kiefer's unusual behavior immediately before being taken into custody.[2] (R. at 260–62.)

---

2. Officer Martin described Kiefer's behavior as follows:

I then walked up to the front door. Ah, I had my flashlight in my hand and I ah, knocked on the door with the flashlight and yelled Sheriff's Department, Sheriff's Department, yelled it several times. After about three or four times ah, I noticed Mr. Kiefer walking out of the back bedroom. . . . He walked out, started toward the door, stopped looked out the window, looked at me. I yelled at him, Sheriff's[ ] Department, Sheriff's Department, he turned around, walked back into his bedroom. A few moments later he come back out holding a . . . black powder pistol in his hand.

Deputy Sheriff Clifford Hibbs of the La-Grange County Sheriff's Department followed Martin. (R. at 270.) He testified that there were four rounds remaining in Kiefer's gun. (R. at 272–74.) Moreover, he testified that Kiefer's gun was single-action, meaning that Kiefer would have to cock the gun before firing again. (R. at 275.)

Michael Brothers, Chris Meringa's brother-in-law, testified next for the State. (R. at 283–84.) Brothers spoke with Travis Kiefer soon after the shooting. (R. at 284–85.) The following dialogue occurred:

Q: Tell the jury what Travis said.

A: Ah, he come to the sliding glass door and ah, knocked on it. My father-in-law and I proceeded to open the door and he was asking for Chris. And I said Chris is busy can I help you. And he goes, yes. He said ... that his grandfather had just ... shot[ ] towards Chris.

Q: O.K., and he was ...

A: He was worried and he wanted to find out [i]f Chris was all right.

(R. at 286.)

The final witness to testify was Officer Tad Oakley, a detective with the LaGrange County Sheriff's Department. (R. at 288.) Oakley interviewed Travis Kiefer the day after the shooting. (R. at 289.) Travis told Oakley that his grandfather "shot towards a tree and the boy." (R. at 294.) Oakley further testified that police used metal detectors but were unable to locate the bullet fired from Kiefer's gun, (R. at

299–300), and saw no evidence of broken limbs on the bush allegedly shot at by Kiefer. (R. at 300.)

The question here is whether Kiefer acted with the requisite intent to kill Meringa when he fired his gun. In a prosecution for attempted murder, the State must show a specific intent to kill. *See Armstrong v. State*, 429 N.E.2d 647 (Ind.1982). Intent to kill may be inferred from the nature of the attack and the circumstances surrounding the crime. *Nunn v. State*, 601 N.E.2d 334 (Ind.1992). Additionally, the trier of fact may infer intent to kill from the use of a deadly weapon in a manner likely to cause death or great bodily harm. *Wilson v. State*, 697 N.E.2d 466 (Ind.1998).

This Court has on very rare occasion overturned murder and attempted murder convictions because of insufficient evidence establishing an intent to kill. *See, e.g., Bethel v. State*, 730 N.E.2d 1242 (Ind.2000) (reversing attempted murder conviction where record was devoid of any probative evidence establishing that defendant, while committing robbery and forcing two store clerks outside, pointed his gun at the clerks before shooting); *Nunn v. State*, 601 N.E.2d 334 (reducing murder conviction to involuntary manslaughter where defendant and victim did not exchange words and defendant struck victim only once with his hands, causing an unusual injury); *Pearson v. State*, 523 N.E.2d 747 (Ind.1988) (reversing attempted murder

...
At that point when I s[aw] him coming back towards the front door with the ... pistol in his hand I yelled at the other officers that he has a gun.... Mr. Kiefer walked outside the, the front door on to the porch. When he walked out on the porch he had his gun out in his hand like this, he was starting to level it down, when I yelled.... [H]e was holding it ... [at] belt level. It started to

move down. I was off to the side of him only six, seven feet away. I yelled at him several more time[s], Sheriff's Department, Sheriff's Department, drop the gun, drop the gun. He then looked over at me, stepped back, laid the gun down and stepped forward and stood there. We then handcuffed him.

(R. at 260–62.)

conviction where defendant's conduct and surrounding events did not evidence an intent to kill). The present case has much in common with these.

 First, Kiefer did not even know the identity of the person walking down the road. Meringa testified that he did not know Kiefer, had never spoken with him, and had experienced no problems with him previously. The record reveals no motive or reason for Kiefer to kill Meringa. While motive is not an element of the crime, the absence of motive is a significant exculpatory factor here because an inference is necessary to establish Kiefer's intent to kill Meringa. *See, e.g., Osbon v. State*, 213 Ind. 413, 13 N.E.2d 223 (1938); *German v. State*, 166 Ind.App. 370, 337 N.E.2d 883 (1975).

Second, the evidence presented shows that Kiefer's conduct at the scene was inconsistent with that of a man who intended to kill. Kiefer was standing in a well-lit area near his garage in the presence of four witnesses. (R. at 206, 221, 229.) Kiefer also had four rounds remaining in his gun that he could have fired at Meringa. Meringa testified that after the explosion, he turned and looked towards Kiefer's residence. Kiefer had ample opportunity to fire again had he wanted to kill Meringa.

Finally, Kiefer's actions after the shooting did not support the conclusion that he intended to kill Meringa. After shooting, Kiefer said "that kid must be scared now," lending credence to the argument that he intended only to frighten Meringa. (R. at 231.) In addition, Kiefer walked casually back into his home and did not seem agitated or violent immediately after the shooting.

These circumstances lead us to conclude that there was insufficient evidence to convict Kiefer of attempted murder. Kiefer's act was stupid, dangerous, and even crimi-

nal, but based on the record, it did not rise to the level of attempted murder, which was the only crime charged.

### Conclusion

We reverse Kiefer's conviction for attempted murder.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.