## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 17 2017, 5:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Susan D. Rayl
Smith Rayl Law Office, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jefferick Majors, *Appellant-Defendant,* | May 17, 2017 |
| v. | Court of Appeals Case No. 49A02-1609-CR-2156 |
| | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Sheila A. Carlisle, Judge |
| | Trial Court Cause No. 49G03-1512-F1-44240 |

**Barnes, Judge.**

# Case Summary

Jefferick Majors appeals his Level 1 felony convictions for attempted murder. We affirm.

# Issue

Majors raises two issues, which we restate as:

I.      whether the trial court properly admitted evidence of a threat Majors made against the victim; and

II.     whether there is sufficient evidence to support Majors' conviction of the attempted murder of Chelsey Gosman.

# Facts

In 2015, Ryan Byrd was living in a house located in Marion County, Indiana. In October or November of 2015, Byrd allowed his friend Kaylyn Kallenbach and her then-boyfriend Jefferick Majors to move into the house. In late November, Byrd asked the couple to move out for reasons including nonpayment of rent. Majors, upset that he had been asked to move, told Ryan, "I'm going to come back and shoot you and your house, fat boy." Tr. Vol. II p. 38. Majors called Byrd "fat boy" whenever he was angry with him. After Majors and Kallenbach moved out, Ryan's girlfriend, Chelsey Gosman, and her two children moved into Byrd's house.

Approximately three weeks later, on December 10, 2015, Kallenbach contacted Byrd and asked to return to the house to retrieve personal belongings she and

Majors had left behind. Byrd agreed, but told Kallenbach not to bring Majors with her.

[5] Majors drove Kallenbach to Byrd's house in his Mercury Milan. They arrived around 10:45 p.m. Majors stayed in the car. Kallenbach met Gosman at the garage, and the two women began carrying items to the car. Byrd was standing in the garage, holding a shotgun in his hand and carrying a 9-millimeter handgun on his hip.

[6] Byrd and Majors began to argue. Byrd told Majors that he "shouldn't be there." *Id*. at 42. Majors replied, "I don't care. I'm here anyway. What are you going to do about it, fat boy?" *Id*. Majors repeated his prior threat and again told Byrd, "I'm going to come back, and I'm going to shoot you and your house, fat boy." *Id*. at 43. Majors told Gosman that she should "gets [sic] [her] kids out of the house." *Id*. at 141.

[7] Majors and Kallenbach left Byrd's house and drove to the parking lot of a nearby apartment complex. When they arrived, Majors told Kallenbach to "stay put." *Id*. at 105. He got out of the Mercury, and got into the passenger seat of a friend's silver Chevrolet Impala. The car drove away. Majors returned approximately twenty minutes later.

[8] After Majors and Kallenbach left, Byrd and Gosman called 911. A police officer responded, and the couple told the officer about Majors and the threat he made.

[9] When the officer drove away, Gosman took her children to a restaurant, then returned to the house hoping to convince Byrd to leave. Gosman pulled her sport utility vehicle (SUV) into the driveway facing the garage, and parked next to Byrd's sedan. Gosman remained in the driver's seat. She did not turn off the ignition and her vehicle's headlights and taillights were illuminated. Byrd stood outside her driver's-side window, talking with her. The children were in their seatbelts in the backseat.

[10] As Byrd and Gosman were talking, they both noticed a silver Impala driving toward the house. The Impala's windows were down and Byrd recognized Majors as the driver. An unidentified man was seated in the driver's-side back passenger seat. Both Majors and the passenger were holding guns. Byrd heard someone yell, "fat boy." *Id*. at 71. He then heard multiple gunshots and saw flashes of light coming from the Impala. Byrd was shot seven times. Gosman and her children were not injured.

[11] When the gunfire stopped, Gosman called 911 and ran with her children to a neighbor's house. The police responded, and Byrd told them that he believed it was Majors who shot him. Byrd was transported by ambulance to the hospital, where he was treated for his gunshot wounds and released three days later.

[12] The police recovered from the scene twenty shell casings and eight bullets or bullet fragments that were fired by two different guns, a 9-millimeter handgun and a rifle. There were three bullet holes in Gosman's vehicle and eight to nine

bullet holes in the garage door directly in front of where Gosman's and Byrd's vehicles were parked.

[13] Majors was arrested on December 11, 2015. He was charged with four counts of Level 1 felony attempted murder for the attempted murders of Byrd, Gosman, and Gosman's two minor children. The two attempted murder counts related to Gosman's minor children were dismissed.

[14] On July 29, 2016, Majors filed a motion in limine to exclude evidence of his alleged marijuana use, and testimony concerning the threat he made against Byrd three weeks prior to the shooting. He did not seek to exclude evidence of the threat he made an hour before committing the crimes. Following a hearing, the trial court granted the motion in limine as to the marijuana use, but denied it as to the threat.

[15] After a two-day jury trial, Majors was found guilty of two counts of Level 1 felony attempted murder. He was sentenced to thirty years in the Indiana Department of Correction on each count, with the sentences to run consecutively.

## Analysis

### *I. Admission of Evidence*

[16] Majors argues that the trial court abused its discretion by admitting evidence of his prior threat against Byrd. Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for

abuse of discretion. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015). We will reverse only if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.*

[17] According to Majors, the evidence of his prior threat against Byrd was inadmissible under Indiana Evidence Rules 404(b) and 403 because the threat's probative value was outweighed by its prejudicial effect. Majors' arguments, specifically, are that the threat was admitted to show he acted in conformity with the threat, was too remote in time to be relevant, was of little probative value to show hostility between Majors and Byrd, and was needlessly cumulative because the same threat was made on the day the attempted murder occurred. The State contends that the evidence was properly admitted to show Majors' motive for committing the crimes and the hostility between Majors and Byrd.

[18] Evidence Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* Evidence that would otherwise be excluded by Evidence Rule 404(b) is admissible if the court determines that: (1) the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act; (2) there is sufficient proof that the defendant in fact committed the act; and (3) the probative value of the evidence

is not substantially outweighed by the danger of unfair prejudice. *Camm v. State,* 908 N.E.2d 215, 223 (Ind. 2009); *see also* Ind. Evidence Rule 403.

[19] Evidence Rule 403 provides that trial courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Because all relevant evidence tends to be inherently prejudicial, the proper inquiry under Evidence Rule 403 requires balancing the probative value of proffered evidence against the likely unfair prejudicial impact of that evidence. *Fuentes v. State,* 10 N.E.3d 68, 73 (Ind. Ct. App. 2014), *trans. denied.* "When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will substantially overestimate the value of the evidence or that the evidence will arouse or inflame the passions or sympathies of the jury." *Id.*

[20] The trial court did not abuse its discretion in admitting into evidence Majors' prior threat. Majors' threat against Byrd, that he would return and shoot Byrd and Byrd's house, indicated that relations between Majors and Byrd were strained, and demonstrated Majors' motive and intent to commit the attempted murder. Evidence of motive is always relevant in the proof of a crime. *Ross v. State*, 676 N.E.2d 339, 346 (Ind. 1996). The probative value of the evidence was not substantially outweighed by the possible prejudicial effect.

[21] The threat was not remote in time. It was made three weeks prior to the attempted murder and immediately after Byrd told Majors to leave his house.

*See id.* (trial court did not abuse its discretion in finding that threats made two months before the murder by defendant against victim were admissible). Although Majors made the same threat approximately one hour before committing the attempted murder, evidence of the prior threat was not needlessly cumulative. The mere fact that the jury hears the same evidence more than once does not render the evidence prejudicial. *See Gaines v. State,* 999 N.E.2d 999, 1005 (Ind. Ct. App. 2013) (admission of evidence is harmless and not grounds for reversal where the evidence is merely cumulative of other evidence properly admitted). No error occurred here.

## *II. Sufficiency of the Evidence of Intent to Kill*

[22]    Majors next contends that insufficient evidence was presented by the State to prove beyond a reasonable doubt that he intended to kill Chelsey Gosman. When reviewing a claim of insufficient evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Suggs v. State*, 51 N.E.3d 1190, 1193 (Ind. 2016). We will consider only the evidence and reasonable inferences therefrom that support the conviction. *Id.* We will affirm if there is probative evidence from which a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Id.*

[23]    Majors specifically contends there was insufficient evidence to prove beyond a reasonable doubt that he had specific intent to kill Gosman. Majors argues that his threats were directed toward Byrd and that prior to the shooting, he warned Gosman to remove her children from Byrd's home.

[24] Majors was charged with:

> [A]ttempt[ing] to commit the crime of Murder, which is to intentionally kill another human being, namely: Chelsey Gosman, by engaging in conduct, that is: intentionally shooting a deadly weapon at and against . . . Chelsey Gosman with the intent to kill, which constituted a substantial step toward the commission of said crime of Murder."

[25] Appellant's App. pp. 26-27. To convict Majors of attempted murder, the State was required to prove beyond a reasonable doubt that he engaged in conduct that constituted a substantial step toward intentionally killing another human being. Ind. Code §§ 35-41-5-1 (2014) (attempt); 35-42-1-1 (2014) (murder). "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a) (1977).

[26] A factfinder may infer specific intent to kill from the nature of an attack and the circumstances surrounding the crime. *Kiefer v. State*, 761 N.E.2d 802, 805 (Ind. 2002). Such intent may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm. *Id*. Discharging a weapon in the direction of a victim is substantial evidence from which a factfinder could infer intent to kill. *Corbin v. State,* 840 N.E.2d 424, 429 (Ind. Ct. App. 2006).

[27] The evidence presented was sufficient to prove Majors fired a deadly weapon at Gosman with intent to kill. The evening before the shooting occurred, Majors drove Kallenbach to Byrd's house so that Kallenbach could retrieve items she and Majors left at Byrd's house. Before leaving, Majors threaten to return and shoot Byrd and his house. Gosman heard the threat. She asked Majors not to

follow through with the threat because she had children in the house. Majors told Gosman that she should remove her children from the home.

[28] During the time Majors lived in Byrd's house and at the time of the shooting, Gosman drove a blue SUV. Testimony was presented that Majors was familiar with Gosman's vehicle. At the time of the shooting, Gosman's SUV and Byrd's sedan were parked in Byrd's driveway, facing the garage. Byrd was standing next to the driver's-side window of the SUV. The driver's-side window was down. Gosman was seated in the driver's seat, talking with Byrd, and the headlights and taillights on her vehicle were illuminated. Gosman looked out of the driver's side window and saw the Chevrolet Impala driving along the street toward Byrd's house. She saw "side-by-side sparks coming from the guns [in the vehicle] and then heard the gunshots." Tr. Vol. II p. 144.

[29] As Majors drove by Byrd's house, he and his passenger fired at least twenty rounds from a handgun and a rifle in the direction of Gosman. Bullets flattened a tire on Gosman's SUV and ruptured the gasoline tank. Bullet holes were found in the trunk of the SUV, the rear passenger-side door, and the front passenger-side door. Eight or nine bullet holes were found in the garage door.

[30] Based on the foregoing, we conclude that sufficient evidence was provided from which the jury could have inferred beyond a reasonable doubt that Majors specifically intended to kill Gosman.

# Conclusion

The trial court properly admitted evidence of Majors' prior threat against Byrd, and there was sufficient evidence to support Majors' conviction for the attempted murder of Chelsey Gosman. We affirm.

Affirmed.

Kirsch, J., and Robb, J., concur.