

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael A. Miller,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 13, 2018

Court of Appeals Case No.
28A01-1712-CR-2918

Appeal from the Greene Circuit
Court

The Honorable Erik C. Allen,
Judge

Trial Court Cause No.
28C01-1408-F1-2

**Mathias, Judge.**

[1] Following a bench trial in Greene Circuit Court, Michael Miller was convicted of attempted murder. On direct appeal, Miller argued that he was denied his right to a speedy trial, that the trial court erred by rejecting his insanity defense, and that the trial court applied the incorrect *mens rea* of "knowingly" in convicting him of attempted murder. We rejected Miller's first two arguments,

but agreed with the last. *Miller v. State*, 72 N.E.3d 502, 518 (Ind. Ct. App. 2017) ("*Miller I*"), *trans. granted*. We therefore reversed Miller's conviction for attempted murder and remanded for retrial. *Id*. Our supreme court granted transfer and disagreed with our determination that a retrial was necessary but summarily affirmed the remainder of our opinion. *Miller v. State*, 77 N.E.3d 1196, 1197 (Ind. 2017) (per curiam) ("*Miller II*"). Instead, the court remanded with instructions that the trial court apply the appropriate *mens rea* to the existing evidence. *Id*. On remand, the trial court explicitly applied the correct *mens rea* and again found Miller guilty of attempted murder. In this second appeal, Miller presents two issues for our review, which we reorder and restate as: (1) whether there was insufficient evidence to support Miller's conviction for attempted murder, and (2) whether the trial court abused its discretion when it denied Miller's motion for a change of judge on remand.

[2] We affirm.

## Facts and Procedural History

*A. Facts Underlying Miller's Conviction*

[3] The facts underlying Miller's conviction were set forth in our opinion in his first direct appeal as follows:

> At about 11:30 p.m. on the night of August 10, 2014, Jeremy Kohn was sitting on the porch of his residence in Bloomfield with his girlfriend, Kylee Bateman. Kohn and Bateman observed Miller twice approach a neighboring house, knock on the door or ring the door bell, and then walk away. Kohn did not know Miller personally but believed he may have gone to school with

him. Kohn and Bateman waved at Miller. Bateman was telling Kohn a story that may have made them both laugh; Miller apparently believed Kohn and Bateman were laughing at him. He then approached Kohn "nonchalantly," drew a pocketknife with a three-to-four-inch blade, and cut Kohn's throat without saying a word. Tr. p. 53. Miller, who had a "blank look" on his face, then turned around and left, still without saying anything. *Id.* The cut to Kohn's neck was not deep enough to damage his jugular vein, carotid artery, or trachea, although a slightly deeper cut could have done so and would have posed a risk of death. The wound required over forty stitches to close.

On August 13, 2014, Marshall Randy Raney of the Worthington Police Department responded to a report of a suspicious person in a local cemetery. Worthington is about twelve miles from Bloomfield. The suspicious person was Miller. Marshall Raney believed Miller seemed "backward" and quiet. *Id.* at 74. Miller told Marshall Raney that he was trying to hitchhike his way to Indianapolis. At the time of this encounter with Marshall Raney, Miller had not yet been identified as a suspect in the attack on Kohn.

Later on August 13, Miller was arrested in Worthington . . . . As Miller was being placed in handcuffs by Deputy Harvey Holt of the Greene County Sheriff's Department, he said that he knew why he was being arrested and asked what charges he would face. Miller then submitted to an interview conducted by Officer Marvin Holt of the Bloomfield Police Department after waiving his Miranda rights.

During the interview, Miller said he had been attempting to return a textbook and some flashcards to a former teacher; Miller was twenty-four years old at the time of the crime. He volunteered several times that he was not "paranoid" or "psychotic" or on drugs, but he also said that people he encountered often attempted to frighten him or laughed at him. Ex. 7. He then admitted that he cut Kohn's throat with a knife after Kohn and Bateman smiled at him, and Kohn looked at

Bateman and shook his head. Officer Holt related that family members had expressed concern about Miller's mental health and asked Miller whether he believed he needed help or medication; Miller denied that he did so and said he believed he was fine. Miller said that, because he did not hear any sirens after cutting Kohn's throat, he assumed neither Kohn nor Bateman called police or the police did not care, and he decided to go to Indianapolis, apparently by a combination of walking and hitchhiking. Miller also engaged Officer Holt in conversation about why it had taken several days for police to contact him and said he was aware that what he had done was against the law. Officer Holt asked Miller whether he wanted to kill Kohn, and Miller replied that he did not care. He said that he accepted responsibility for what he had done and that he assumed he would go to jail and asked Officer Holt if he could bring his Bible to jail. At one point, after Officer Holt asked Miller whether he might hurt someone again in the future, Miller explained, "Some people can view human life the same way but have different outcomes because of emotion. I don't have the emotion." *Id*. at 15:50. Miller had a calm demeanor during the interview, spoke throughout in an even and emotionless tone of voice, and ate a candy bar and drank a soda while he talked to Officer Holt.

*Miller I*, 72 N.E.3d at 506–07.

### B. *Miller's Prosecution and Trial*

[4] The State subsequently charged Miller with Level 1 felony attempted murder and Level 3 felony aggravated battery.[1] The charging information for attempted murder alleged that Miller "did knowingly or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn, and Michael A.

---

[1] The State later amended the information to reduce the battery charge to a Level 5 felony.

Miller did engage in conduct which constituted a substantial step toward the commission of the crime of murder, to-wit: cut Jeremy Kohn's throat with a knife. . . ." Original Appeal App. p. 29.

[5] As explained in our opinion in Miller's first appeal, "Miller has a lengthy history of mental illness." *Miller I*, 72 N.E.3d at 507. Thus, on August 15, 2014, Miller's trial counsel filed a notice of defense of mental disease or defect. Miller was found incompetent to stand trial on March 16, 2015, and was treated at Logansport State Hospital. On July 21, 2015, the hospital certified to the trial court that Miller was competent to stand trial, and he was transported back to the Greene County Jail to await trial.

[6] At Miller's January 20, 2016 bench trial, Miller presented evidence from a psychologist who opined that at the time of the crime, Miller suffered from a mental disease or defect that affected his ability to appreciate the wrongfulness of his conduct. This expert testified that, although Miller acknowledged he had done something wrong, he lacked understanding of why it was wrong. A court-appointed psychiatrist agreed that Miller suffered from schizophrenia but believed that Miller "probably *did* understand the wrongfulness of his actions," yet believed that Miller was "unable to resist the strong urge to nevertheless take those actions at the time that they occurred. . . ." Trial Tr. p. 170 (emphasis

added). Yet another psychiatrist also testified that Miller was unable to appreciate the wrongfulness of his conduct.[2]

[7] On January 27, 2016, the trial court entered detailed, written "Findings, Conclusions and Judgment of Conviction" (the "Original Findings"). In the Original Findings, the trial court explained why it was discounting the expert opinions regarding Miller's sanity or lack thereof and rejected his defense of mental disease or defect. It noted that it was relying instead upon its courtroom observations of Miller, as well as his comportment during the police interview and his actions and demeanor near the time of the crime.

[8] As we recounted in our original opinion:

> The [Original] [F]indings also repeated the language of the charging information for attempted murder, namely that Miller "did *knowingly* or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn. . . ." The trial court found and concluded "that Defendant had the requisite *intent to kill* as he used a knife, which is a deadly weapon, to deliberately cut the victims [sic] throat in a manner that was likely to cause death or great bodily harm." The trial court also expressly found beyond a reasonable doubt that Miller "did

---

[2] This is precisely the conundrum mentally ill criminal defendants face in Indiana. Severe mental illness at the time of the charged offense can be ignored and the defendant referred to mental health confinement where psychotropic medications are forcibly administered in order to restore the defendant's mental health for trial. The proper protocol should be to use the assessment of mental health professionals immediately after one or more crimes are charged to consider whether the defendant could have formed the legally required *mens rea* to commit the crime charged. If not, the defendant should more properly be committed to Indiana's mental health system for treatment, rather than charged with crime(s), where such a defendant might well spend the rest of her or his life.

>*knowingly* or intentionally attempt to commit the crime of Murder, to-wit: to knowingly kill Jeremy Kohn. . . ."

*Miller I*, 72 N.E.3d at 509–10 (record citations omitted) (emphasis added).

[9] The trial court entered judgments of conviction of guilty but mentally ill for both Level 1 felony attempted murder and Level 5 felony battery, but at sentencing merged the battery conviction with the attempted murder conviction. It then sentenced Miller to a term of thirty years, with twenty years executed and ten years suspended to probation.

*C. Miller's First Appeal*

[10] Miller appealed and argued that the trial court denied his right to a speedy trial under Indiana Criminal Rule 4(B), that the trial court improperly rejected his insanity defense, and that the trial court applied the incorrect *mens rea* in convicting him of attempted murder. *Miller I*, 72 N.E.3d at 506. With regard to Miller's first argument, this court held, given the complexity of his insanity defense, the trial court did not abuse its discretion by granting the State's request for a continuance and extending the start of Miller's trial for ninety days, and that Miller's trial therefore began within the limits prescribed by Criminal Rules 4(B) and 4(D). *Id.* at 513. With regard to his second argument, we held that "despite substantial evidence of Miller's serious mental health problems, there is sufficient evidence to support the trial court's rejection of his insanity defense." *Id.* at 515. Lastly, we held that the trial court appeared to have applied the incorrect "knowingly" *mens rea* in finding Miller guilty of attempted murder. *Id.* at 517. Specifically, we held:

[G]iven the severity of the charge against Miller and the incorrect language of the charging information, we find it impossible to ignore the trial court's findings that clearly misstate the proper standard for convicting a defendant of attempted murder. In a jury trial, there is no way to divine a jury's thought process except by reference to the jury instructions; here, without jury instructions, we can divine that process by the trial court's findings.

Both the charging information and the trial court's findings refer to the long-discredited notion that a "knowing" *mens rea* was sufficient to convict Miller of attempted murder. It was not. Moreover, Miller's intent was a central issue in this case. Despite our affirmance of the rejection of Miller's insanity defense, we offer no opinion at this time as to whether there is sufficient evidence that Miller acted with the specific intent to kill Kohn. It suffices to say that, even if the evidence could have supported that finding, we believe it also could support the conclusion he did not act with such intent.

*Id*. at 517.

[11] We therefore reversed Miller's conviction for attempted murder. *Id*. at 518. We then confronted the question of the appropriate remedy: whether to reverse and remand for a new trial, or to reverse and remand with instructions for the trial court to apply the correct *mens rea* to the evidence presented in the first trial. *Id*. We opted for the former option and reversed and remanded for retrial. *Id*.

[12] Our supreme court granted transfer, and on July 12, 2017, issued an opinion that summarily affirmed all of our opinion except our choice of remedy. *Miller II*, 77 N.E.3d at 1197. Instead, our supreme court held that "the correct remedy in these circumstances is a remand for reconsideration by the trial court." *Id*.

Accordingly, our supreme court reversed Miller's conviction for attempted murder and "remanded this case to Judge Allen with instructions to apply the appropriate legal standard to the existing evidence." *Id.*

[13] On August 11, 2017, Miller filed a petition for rehearing. On August 17, 2017, prior to our supreme court's decision on Miller's petition for rehearing, and thus prior to the court's initial opinion having been certified, the trial court entered revised written findings and conclusions finding Miller guilty under the proper *mens rea* required for attempted murder, i.e., acting with the specific intent to kill. Appellant's App. Vol. 3, pp. 2–7.

[14] On August 31, 2017, Miller filed in our supreme court a motion for writ in aid of appellate jurisdiction. In this motion, Miller argued that the trial court lacked jurisdiction to issue its findings and conclusions prior to the decision of our supreme court on Miller's motion for rehearing, i.e., the supreme court's opinion was not yet certified, and the trial court could not take any action in reliance thereon until it was certified. *See* Ind. Appellate Rule 65(E). In addition, Miller argued that the trial court was biased against him and requested that our supreme court appoint a new judge to hear his case and order a retrial.

[15] On September 28, 2017, our supreme court entered an order granting Miller's motion for writ in aid of appellate jurisdiction, noting that its opinion had not yet been certified and that the trial court therefore did not have jurisdiction to enter its new findings and conclusions; our supreme court's order did not

mention Miller's requests for the appointment of a new judge or a retrial.[3] Thus, our supreme court did not grant Miller's requests for a new trial judge and a new trial. That same day, our supreme court also denied Miller's petition for rehearing. Accordingly, the court's opinion was listed as certified on October 2, 2017.

### D. On Remand to the Trial Court

On October 3, 2017, Miller filed in the trial court a motion for change of judge. The trial court held a hearing on the motion on November 21, 2017, and denied it on December 4, 2017. Also, on December 4, the trial court issued its revised Findings, Conclusions, and Judgment of Conviction ("Revised Findings"), again finding Miller guilty of attempted murder, but this time referencing the proper *mens rea*. Miller now appeals.

## I. Sufficiency of the Evidence

Miller claims that the evidence was insufficient to support the trial court's finding that he acted with the specific intent to kill required to support his conviction for attempted murder. Our standard of review on challenges to the sufficiency of the evidence is well settled:

> Upon a challenge to the sufficiency of evidence to support a conviction, a reviewing court does not reweigh the evidence or judge the credibility of the witnesses, and respects the [fact finder]'s exclusive province to weigh conflicting evidence. We have often emphasized that appellate courts must consider only the probative evidence and reasonable inferences supporting the

---

[3] *Miller II*, No. 28S04-1707-CR-00468, Docket Entry Sept. 28, 2017, *see* https://mycase.in.gov.

verdict. Expressed another way, we have stated that appellate courts must affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.

*McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005) (citations and internal quotations omitted).

[18] Murder is generally defined by statute as knowingly or intentionally killing another human being. Ind. Code § 35-42-1-1(a). And the general attempt statute provides that "[a] person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. . . ." Ind. Code § 35-41-5-1(a). Despite this statutory language, it is well settled that a conviction for attempted murder requires proof of more than a "knowing" *mens rea*; it instead requires proof of specific intent to kill. *Spradlin v. State*, 569 N.E.2d 948, 950 (Ind. 1991); *see also Kadrovach v. State*, 61 N.E.3d 1241, 1246 (Ind. Ct. App. 2016), *trans. denied*. Accordingly, to convict Miller of attempted murder, the State was required to prove beyond a reasonable doubt that Miller, acting with the specific intent to kill, engaged in conduct that constituted a substantial step toward the commission of the crime of murder.

[19] In attacking the sufficiency of the evidence, Miller first contends that the trial court, yet again, used the improper standard in finding him guilty.[4] That is,

---

[4] In attacking the sufficiency of the evidence, Miller claims that the trial court should have permitted him to reargue his case and claims that the failure of the trial court to do so violated his due process rights and the

Miller claims that the trial court used the improper *mens rea* of "knowingly" in its Original Findings and claims that the trial court's Revised Findings used the same standard as it had in the Original Findings. Thus, he contends, the trial court necessarily used the same, improper legal standard in finding him guilty on remand. The record does not support Miller's contention.

[20] The trial court's Original Findings referenced both the "knowingly" *mens rea* and the "intent to kill." In its Revised Findings, the trial court clearly, explicitly, and unambiguously found that Miller acted with the requisite specific intent to kill. *See* Appellant's App. Vol. 2, p. 11 ("Without hesitation or reservation, the Court concludes that the evidence presented and the findings set forth herein support the conclusion that the State proved beyond a reasonable doubt that the Defendant had specific intent to kill."). We therefore reject Miller's claim that the trial court applied the improper legal standard on remand.

[21] Miller also claims that the evidence does not support a reasonable inference that he acted with the specific intent to kill when he cut the victim's throat. Miller argues that the trial court's Revised Findings imply that the trial court thought that the pocket knife must always be considered a deadly weapon. Again, we disagree.

Sixth Amendment. However, our supreme court ordered the trial court on remand to "apply the appropriate legal standard to the existing evidence," and made no reference to permitting Miller or the State to reargue the case. *Miller II*, 77 N.E.3d at 1197. The trial court followed this instruction on remand. We further note that Miller, in his motion for a writ in aid of appellate jurisdiction, requested that our supreme court appoint a new trial judge and order a retrial, presenting many of the same concerns that he now presents on appeal. But our supreme court did not grant Miller's request for a new trial judge or a retrial. If Miller has an issue with the remedy ordered by our supreme court, he must take up the issue with that court, as we are in no position to second-guess the instructions of our supreme court.

A "deadly weapon" is defined by the criminal code to include:

> A destructive device, weapon, device . . . or other material that in the manner it:
>
>> (A) is used;
>>
>> (B) could ordinarily be used; or
>>
>> (C) is intended to be used;
>
> is readily capable of causing serious bodily injury.

Ind. Code § 35-31.5-2-86(a)(2).

It is well-settled that a knife may be considered to be a deadly weapon. Indeed, pocket knives, which Miller used, have been held to be deadly weapons. *See Hollowell v. State*, 707 N.E.2d 1014, 1020–21 (Ind. Ct. App. 1999). The case cited by Miller in support of his argument that a pocket knife is not necessarily a deadly weapon is readily distinguishable. In *Sluss v. State*, 436 N.E.2d 907, 911 (Ind. Ct. App. 1982), a pocket knife was used to "tinker" with a door lock, not cut someone's throat. Here, Miller used the pocket knife not to tinker with a lock, but to slit a man's throat. The knife also had a three- to four-inch blade, and Miller used it to cut the victim's throat, requiring over forty-stitches to close. Although the cut was, fortunately, not deep enough to cut the victim's jugular vein or carotid artery, a slightly deeper cut could have done so. Thus, the trial court did not err by noting that the pocket knife used by Miller was a deadly weapon.

[24] Nor did the trial court err by inferring a specific intent to kill from Miller's use of the deadly weapon. Typically, a defendant's *mens rea* must be inferred from the circumstances. *West v. State*, 805 N.E.2d 909, 915 (Ind. Ct. App. 2004), *trans. denied*. With regard to the crime of attempted murder, it has long been held that the specific intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm. *Kiefer v. State*, 761 N.E.2d 802, 805 (Ind. 2002); *Randolph v. State*, 516 N.E.2d 24, 25 (Ind. 1987).

[25] Here, Miller slit the victim's throat with a three- to four-inch knife, requiring the victim to have over forty stitches to close the wound. The knife narrowly missed cutting the victim's jugular vein and carotid artery, and had it been a slightly deeper cut, would have posed a risk of death. Under these facts and circumstances, the trial court, acting as the trier of fact, could reasonably conclude that Miller acted with the specific intent to kill when he slit the victim's throat. Under our extremely deferential standard of review on claims of insufficient evidence, we can only conclude that the State presented evidence sufficient to support Miller's conviction for attempted murder.

## II. Motion for Change of Judge

[26] Miller also argues that the trial court erred when it denied his motion for a change of judge. Pursuant to Indiana Criminal Rule 12(B):

> In felony and misdemeanor cases, the state or defendant may request a change of judge for bias or prejudice. *The party shall timely file an affidavit that the judge has a personal bias or prejudice*

*against the state or defendant.* The affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. The request shall be granted if the historical facts recited in the affidavit support a rational inference of bias or prejudice.

Ind. Crim. Rule 12(B) (emphasis added). The timeliness of such motions is governed by Criminal Rule 12(D), which provides:

> **(D) Time Period for Filing Request for Change of Judge or Change of Venue.** In any criminal action, no change of judge or change of venue from the county shall be granted except within the time herein provided.
>
> (1)  *Thirty Day Rule.* An application for a change of judge or change of venue from the county shall be filed within thirty (30) days of the initial hearing. Provided, that where a cause is remanded for a new trial by the court on appeal, such application must be filed not later than thirty (30) days after the defendant first appears in person before the trial court following remand.
>
> (2)  *Subsequently Discovered Grounds.* If the applicant first obtains knowledge of the cause for change of venue from the judge or from the county after the time above limited, the applicant may file the application, which shall be verified by the party specifically alleging when the cause was first discovered, how it was discovered, the facts showing the cause for a change, and why such cause could not have been discovered before by the exercise of due diligence. Any opposing party shall have the right to file counter-affidavits on such issue within ten (10) days, and after a hearing on the motion, the ruling of the court may be reviewed only for abuse of discretion.

[27] Criminal Rule 12(B) provides that the request for a change of judge "shall be granted if the historical facts recited in the affidavit support a rational inference of bias or prejudice." Thus, a change of judge under this rule "is neither 'automatic' nor 'discretionary.'" *Sturgeon v. State*, 719 N.E.2d 1173, 1181 (Ind. 1999) (quoting *Blanche v. State*, 690 N.E.2d 709, 714 (Ind. 1998)). The appropriate standard of review of a trial judge's decision to grant or deny such a motion is whether the judge's decision was clearly erroneous. *Id.* at 1182.

[28] This clearly erroneous standard, however, applies only to motions made within the "Thirty Day Rule" set forth in Criminal Rule 12(D)(1), i.e., motions filed no later than thirty days after the initial hearing or, if the case is remanded for a new trial by the court on appeal, no later than thirty days after the defendant first appears in person before the trial court following remand. If the motion for change of judge is made outside this thirty-day rule, then the motion is governed by Criminal Rule 12(D)(2), which provides that such motions "may be reviewed only for abuse of discretion."

[29] Here, Miller admits that his motion for a change of judge did not fall within the scope of Criminal Rule 12(D)(1), because it was not filed within thirty days of his initial hearing, nor was his case remanded for a new trial. Instead, it was remanded only for the trial court "to apply the appropriate legal standard to the existing evidence." *Miller II*, 77 N.E.3d at 1197. Thus, Miller's motion falls within the scope of Criminal Rule 12(D)(2), and as such is, by the explicit language of this rule, reviewable only for an abuse of discretion.

[30] In determining whether the trial court abused its discretion in denying Miller's motion for a change of judge, we also keep in mind that we presume that a judge is not biased or prejudiced against a party. *Garland v. State*, 788 N.E.2d 425, 433 (Ind. 2003). Nor may prejudice be derived from judicial rulings. *Id*. A trial judge's exposure to evidence through judicial sources is, alone, insufficient to establish bias. *Id*. (citing *Sturgeon*, 719 N.E.2d at 1181). Nor does the fact that a defendant has appeared before a certain judge in prior cases establish the existence of bias or prejudice. *Id*. (citing *Lasley v. State*, 510 N.E.2d 1340, 1341 (Ind. 1987)). A showing of prejudice sufficient to support a motion for a change of judge must be established from personal, individual attacks on a defendant's character, or otherwise. *Id*. A defendant cannot merely assert prejudice on the grounds that the judge has ruled against him in a prior proceeding. *Id*.

[31] In the present case, Miller relies wholly on the Revised Findings the trial court entered on remand to support his claim for a change of judge. Specifically, he argues that the substance of the Revised Findings demonstrates the trial judge's bias and that the trial judge's action of entering findings prematurely establish an appearance of bias or prejudice of the trial judge against him. We disagree.

[32] First, we find no support for a claim of an appearance of bias or prejudice based on the trial court's act of prematurely entering its findings on remand. Our supreme court issued its opinion on July 12, 2017. The trial court entered its findings on August 17, 2017, over one month after our supreme court's opinion. Had Miller not filed a petition for rehearing, this would have been sufficient time for our supreme court's opinion to have been certified. But here, Miller

had already filed a petition for rehearing on August 11, 2017, thereby postponing the certification until our supreme court could rule on the petition. The trial court may have been unaware of Miller's petition for rehearing and therefore entered its findings prematurely, but this action does not establish any appearance of bias or prejudice on the part of the trial judge. And the fact that the premature findings were not in favor of Miller does not support any inference of bias. Although Miller claims that the premature findings "harmed" him and benefitted the State, the trial court's premature findings were vacated upon Miller's successful efforts to obtain a writ in aid of appellate jurisdiction. Thus, he was not harmed by the trial court's premature actions.[5]

[33] Miller also claims that the substance of the trial court's Revised Findings supports an appearance of bias or prejudice against him. Again, we disagree. The trial court's Revised Findings do exactly what the supreme court instructed the trial court to do on remand: reconsider the evidence under the appropriate legal standard, i.e., whether the evidence was sufficient to show that Miller acted with the specific intent to kill.

[34] Miller also complains that the trial court "staunchly contended" that it had applied the proper legal standard in its original findings. Appellant's Br. at 28–

---

[5] We find Miller's citation to *State v. Marion Superior Court,* 54 N.E.3d 995 (Ind. 2016), to be unavailing. At issue in that case was Indiana Trial Rule 76(C)(3), which provides for a right to a change of judge in civil cases. *See Marion Superior Court*, 54 N.E.3d at 995. Thus, as noted by the State, the court's holding in *Marion Superior Court* was not premised upon the appearance of bias or prejudice.

29. The trial court's Revised Findings do attempt to explain and justify the trial court's Original Findings. Specifically, the trial court wrote:

> This Court has given lengthy and thoughtful consideration to the appropriate standard for attempted murder, not only at the time that the [O]riginal Findings, Conclusions and Judgment of Conviction was entered but also upon remand. The charging information for Count 1 sets forth the incorrect *mens rea*, and the Court recited the charging information verbatim in two places in the [O]riginal Findings, Conclusions and Judgment of Conviction. However, the Trial Court's purpose for reciting the charging information in original paragraph 2 was to indicate the charge of Attempted Murder had been filed in Count 1, and the purpose in original paragraph 8a was to make a finding that Defendant was guilty of Attempted Murder, a Level 1 felony, beyond a reasonable doubt. **The Court did not consider the "knowing" standard and this conclusion is supported by the record of the case and the Court's [O]riginal Findings, Conclusions and Judgment of Conviction.**
>
> The Court specifically set forth in the [O]riginal Findings, Conclusions and Judgment of Conviction the following: "The Court finds and concludes that Defendant had the requisite intent to kill as he used a knife, which is a deadly weapon, to deliberately cut the victims throat in a manner that was likely to cause death or great bodily harm." This is a specific finding and conclusion consistent with the Indiana Supreme Court's *Kiefer*[6] opinion . . . which establishes that a trier of fact may infer intent to kill from the use of a deadly weapon in a manner likely to cause death or great bodily harm. This identifies the standard considered by the Court and the Court's conclusion that Defendant had specific intent to kill the victim in the instant case.

---

[6] *Kiefer v. State*, 761 N.E.2d 802, 805 (Ind. 2002).

Further, the framework the Court used to consider the evidence followed the standard clearly identified in the State's closing argument . . . .

Contrary to the concerns stated in the opinion of the Court of Appeals and by Justice Slaughter, this Court would not hesitate to change the original order if the evidence did not support the same conclusion under the appropriately stated standard. This Court specifically states that it did consider the specific intent to kill standard when deciding the case originally, **and also re-evaluated and reconsidered all of the evidence under the specific intent to kill standard on remand**. **Without hesitation or reservation, the Court concludes that the evidence presented and the findings set forth herein support the conclusion that the State proved beyond a reasonable doubt that the Defendant had specific intent to kill.**

Appellant's App. pp. 10–11 (italic emphasis in original, bold emphasis added).

[35] Although the trial court did defend its Original Findings in its Revised Findings, we cannot say that this supports an appearance of bias or prejudice against Miller. The trial court still followed the instructions of our supreme court and reconsidered the evidence using the proper *mens rea*. That the trial court again ruled against Miller is not indicative of bias or prejudice. *See Garland,* 788 N.E.2d at 433 (noting that prejudice may not be derived from unfavorable judicial rulings).

[36] Miller also complains that the trial court excluded him from participation in the process of reconsidering the evidence on remand. Miller claims that the trial court should have given him an opportunity to present further "argument,

evidence, briefs, or other input[.]"[7] Appellant's Br. at 27. But this is not what our supreme court instructed the trial court to do on remand. Instead, the court instructed the trial court to simply "apply the appropriate legal standard to the existing evidence." *Miller II*, 77 N.E.3d at 1197. This is what the trial court did.[8]

[37] We also disagree with Miller's contention that the trial court's Revised Findings demonstrate that the trial judge was "unable to view the evidence dispassionately under a different legal standard than that applied in its original findings." *Id.* at 30. To the contrary, the trial court's Revised Findings clearly and explicitly reference the correct legal standard, i.e., that Miller acted with the specific intent to kill. That the trial court also contended that it had found that Miller acted with the specific intent to kill in its Original Findings does not mean that the trial court failed to apply the proper legal standard in its Revised Findings.

[38] Miller also argues that the trial judge was required to disqualify or recuse himself by the Indiana Code of Judicial Conduct, specifically referring to Rule 2.11(A). This rule provides in relevant part:

---

[7] Contrary to Miller's claim that the trial was argued under the wrong *mens rea*, the prosecuting attorney repeatedly argued at trial that there was sufficient evidence of Miller's specific intent to kill. *See* Trial Tr. pp. 203–04. And although Miller's trial counsel stated one time in closing argument, "This wasn't something [Miller] did knowingly or intentionally," he also repeatedly argued that Miller did not have "the intent to murder somebody," and that Miller did not "formulate[] any kind of intent to kill anybody." Trial Tr. p. 215. Thus, both parties referenced the correct *mens rea* in their arguments to the trial court.

[8] Again, we note that, to the extent that Miller claims this deprived him of due process or violated his rights under the Sixth Amendment, his argument is with our supreme court's instructions on remand, which we are not at liberty to second guess.

(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:

> (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding. . . .

Ind. Code Judicial Conduct Rule 2.11. Miller also cites to the first two comments to this rule, which provide:

> [1] Under this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply. In many jurisdictions, the term "recusal" is used interchangeably with the term "disqualification."
>
> [2] A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed.

*Id.*, comments [1], [2].

[39] Miller contends that all of his above-referenced arguments show that an objective person with knowledge of the complete circumstances of his case would have a reasonable basis for doubting the trial judge's impartiality. Yet again, we disagree. The trial court was doing exactly what it was told to do by the Supreme Court, and simply entering its findings prematurely did not bear on the question of the trial judge's presumed impartiality. Furthermore, nothing in the court's Revised Findings establishes that the trial judge's impartiality

might reasonably be questioned. Thus, the trial judge was not required to recuse or disqualify himself under the Indiana Code of Judicial Conduct.

[40] In short, the trial court did not abuse its discretion or otherwise err when it denied Miller's motion for a change of judge. Nothing in the trial court's Revised Findings or the fact that the trial court entered findings prematurely supports Miller's claim that there is an appearance that the trial judge was biased or prejudiced against him.

## Conclusion

[41] The evidence was sufficient to support an inference that Miller acted with the specific intent to kill required to convict him of attempted murder, and the trial court did not abuse its discretion by denying Miller's motion for a change of judge on remand.

[42] Affirmed.

Riley, J., and May, J., concur.