FILED

Aug 11 2023, 10:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Jimmy Gurulé
Elliot Slosar
*Admitted Pro Hac Vice*
Exoneration Justice Clinic
Notre Dame Law School
South Bend, Indiana

Elliot Slosar
The Exoneration Project
Chicago, Illinois

Robert Hochman
Minje Shin
*Admitted Pro Hac Vice*
Sidley Austin LLP
Chicago, Illinois

Mark A. Bates
Highland, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Kelly A. Loy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Leon Tyson,

*Appellant-Petitioner*

v.

State of Indiana,

*Appellee-Respondent.*

August 11, 2023

Court of Appeals Case No.
22A-PC-143

Appeal from the Elkhart Superior Court

The Honorable Teresa L. Cataldo, Judge

Trial Court Cause No.
20D03-1807-PC-37

**Opinion by Judge Pyle**

Judges Crone and Bradford concur.

**Pyle, Judge.**

# Statement of the Case

A jury convicted Leon Tyson ("Tyson") of murder in 2017. This Court affirmed Tyson's conviction on direct appeal. *See Tyson v. State*, No. 20A03-1704-CR-789, 2017 WL 5761227 (Ind. Ct. App. Nov. 29, 2017), *trans. denied*. In 2018, Tyson filed a petition for post-conviction relief. In May 2021, Tyson, represented by attorneys Jimmy Gurulé ("Attorney Gurulé") and Elliot Slosar ("Attorney Slosar"), filed an amended petition for post-conviction relief.[1] Also, in May 2021, Tyson filed a motion for a change of judge pursuant to Post-Conviction Rule 1(4)(b).[2] The post-conviction court denied Tyson's change of judge motion, and

---

[1] At the outset, in full transparency, we note that Attorney Gurulé, who is affiliated with Notre Dame Law School's Exoneration Justice Clinic ("the Clinic"), filed Tyson's appellate brief on September 8, 2022. On November 16, 2022, Attorney Gurulé gave a presentation to several judges on this Court. During this presentation, Attorney Gurulé spoke about the Clinic. He also spoke about one of the Clinic's cases, *Royer v. State*, 166 N.E.3d 380 (Ind. Ct. App. 2021). In *Royer*, this Court affirmed the post-conviction court's order that granted Royer's successive petition for post-conviction relief based on newly discovered evidence and *Brady* violations and vacated Royer's murder conviction. *Id.* at 405. In Tyson's appellate brief, Attorney Gurulé cites *Royer* in support of his argument that the post-conviction court erred in denying Tyson's motion for a change of judge. We note that none of the judges on this panel of Tyson's appeal attended Attorney Gurulé's presentation or discussed the *Royer* case with any of the judges who attended the presentation.

[2] Although Tyson's motion was titled a motion for recusal, we note that Post-Conviction Rule 1(4)(b) does not include the term recusal. Rather, Post-Conviction Rule 1(4)(b) uses the terms change of judge. We will, therefore, refer to Tyson's motion as a motion for a change of judge.

this interlocutory appeal concerns only the post-conviction court's denial of that motion.[3]  Tyson specifically argues that the post-conviction court clearly erred when it denied his motion for a change of judge.  Concluding that the post-conviction court did not clearly err, we affirm the post-conviction court's denial of Tyson's change of judge motion.[4]

We affirm.

# Issue

> Whether the post-conviction court clearly erred when it denied Tyson's motion for a change of judge.

---

[3] We express no opinion on the merits of Tyson's post-conviction relief petition, which is pending before the post-conviction court.

[4] We note that Attorney Gurulé is also representing Pink Robinson ("Robinson") and Iris Seabolt ("Seabolt"), two other petitioners who are appealing the post-conviction court's denial of their change of judge motions.  Robinson's appeal was originally filed under Cause Number 22A-PC-1102, and Seabolt's appeal was originally filed under Cause Number 22A-PC-208.  In May 2022, this Court's motions panel granted Attorney Gurulé's motion to consolidate these two appeals with Tyson's appeal.

Thereafter, in February 2023, Attorney Gurulé initiated an appeal for Reginald Dillard ("Dillard"), a fourth post-conviction petitioner who is appealing the post-conviction court's denial of his change of judge motion.  Dillard's appeal was originally filed under Cause Number 23A-PC-261.  The following month, March 2023, this Court's motions panel granted Attorney Gurulé's motion to consolidate Dillard's appeal into Tyson's appeal.

However, it is well-established that we have the inherent authority to reconsider a ruling by the motions panel while an appeal remains pending.  *Beasley v. State*, 192 N.E.3d 1026, 1029 (Ind. Ct. App. 2022), *trans. denied*.  Here, we have determined that a de-consolidation of these four appeals is necessary.  Accordingly, we have returned each one to its original appellate cause number and will decide each appeal on its own merits.

## Facts

[3]     In May 2021, Tyson, represented by Attorneys Gurulé and Slosar, filed a 117-page amended petition for post-conviction relief.  In the introduction section of his amended petition, Tyson argued as follows:

> An epidemic exists in Elkhart, Indiana where innocent people are wrongfully convicted as a result of police misconduct, false and fabricated testimony, and the widespread failure to disclose material exculpatory evidence.  Tragically, these unjust convictions often take decades to unravel, leaving innocent men and women to languish in prison for crimes they did not commit[.]  The wrongful conviction of Petitioner, Leon Tyson, bears many of the common characteristics of Elkhart's other *known* wrongful conviction cases:  police misconduct; the fabrication of evidence; eyewitness misidentification; and the withholding of material exculpatory evidence.  The newly discovered evidence discussed below demonstrates that Leon Tyson is wrongfully convicted, entitled to a new trial, and deserves to be Elkhart's next exoneree.

(App. Vol. 2 at 33-34) (emphasis in the original).

[4]     Further, in this petition, Tyson argued that he was entitled to post-conviction relief because:

> (1) he [was] actually innocent, and ha[d] located new evidence materially relevant to his innocence that he could not with reasonable diligence have discovered and produced at trial ["(the first post-conviction claim)"]; (2) he ha[d] new evidence demonstrating misconduct by Elkhart police officers under *Brady v. Maryland*, 373 U.S. 83 (1963), materially affecting his substantial rights [("the second post-conviction claim")]; and (3) he [had] received ineffective assistance of counsel in violation of *Strickland v. Washington*, 466 U.S. 668 (1984) and *Martinez v.*

*Ryan*, 566 U.S. 1 (2012) that [fell] below an objective standard of reasonableness and prejudiced Mr. Tyson in a significant way [("the third post-conviction claim")].

(App. Vol. 2 at 118) (footnote omitted).  According to Tyson, "[e]ach ground provide[d] an independent basis for [the post-conviction court] to grant [Tyson] a new trial."  (App. Vol. 2 at 118).

[5]  Also, in May 2021, Tyson filed a motion for a change of judge pursuant to Indiana Post-Conviction Rule 1(4)(b).  Tyson specifically argued that the post-conviction court should grant his motion because the post-conviction court had been a deputy prosecutor in the Elkhart County Prosecutor's Office from 1998 until 2002 ("the first recusal claim").  According to Tyson, "[b]ased upon this Court's prior employment at the Elkhart County Prosecutor's Office – during the period of time that [Tyson] w[ould] present evidence of systemic prosecutorial and police misconduct – there [was] a reasonable question as to whether this Court c[ould] be impartial in determining whether police or prosecutorial misconduct resulted in Mr. Tyson's wrongful conviction."  (App. Vol. 2 at 148).

[6]  Tyson further argued that the post-conviction court should grant his motion for a change of judge because the post-conviction court's order in a prior unrelated case involving Andrew Royer ("Royer") had shown that the post-conviction court had "formed an opinion on the merits of [Royer's] pending claims without hearing evidence."  (App. Vol. 2 at 152).  Therefore, according to Tyson, "[t]he same logic [held] true here, where . . . Tyson argues that the same

systemic failures caused his wrongful conviction." (App. Vol. 2 at 152). Tyson further argued that because the post-conviction court had ultimately granted Royer's motion for a change of judge, the post-conviction court should grant Tyson's motion for a change of judge as well.

[7] At this point, for a better understanding of Tyson's argument and the post-conviction court's response to this argument in its order denying Tyson's motion for a change of judge, we find it helpful to review the facts and history of Royer's case. A jury convicted Royer of murdering Helen Sailor ("Sailor") in 2005. In 2006, this Court affirmed Royer's conviction. *Royer v. State*, No. 20A03-0601-CR-14, 2006 WL 1634766 (Ind. Ct. App. May 31, 2006). In 2007, Royer filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. This Court affirmed the denial. *Royer v. State*, No. 20A04-1106-PC-325, 2011 WL 6595351 (Ind. Ct. App. Dec. 20, 2011).

[8] A few years later, in June 2013, Royer, represented by Attorney Slosar, filed a motion for relief from judgment pursuant to Indiana Trial Rule 60(B). Immediately after filing this motion, Attorney Slosar and Royer's family members gathered in front of the prosecutor's office for a press conference. During the press conference, Attorney Slosar stated there was a "'systemic failure' and an 'epidemic' in Elkhart County where people [were] wrongfully convicted because of police corruption, uninspiring defense counsel and an overzealous prosecutor." (App. Vol. 3 at 57). Attorney Slosar also stated that "these factors contributed to Andrew Royer being convicted of a murder that he is absolutely innocent of." (App. Vol. 3 at 57). In addition, Attorney Slosar

stated that "we have proven that [Royer's] conviction was an absolute fraud and the conviction was based on intentional misconduct." (App. Vol. 3 at 57). Attorney Slosar further referred to the pending Trial Rule 60(B) motion as an appeal and released videotapes of witnesses that would be testifying at the hearing on Royer's motion.

[9] Following the press conference, the State filed a motion for an emergency hearing and a request for an injunction. In support of its motion, the State attached two newspaper articles from the South Bend Tribune. The headline for one of the articles, which is dated June 13, 2018, is "Mentally disabled man says shoddy policing, false statements led to Elkhart murder conviction." (No. 20D03-0309-MR-155, Chronological Case Summary, June 19, 2018 entry). The headline for the other article, which is dated June 14, 2018, is "Attorney of Andrew Royer blasts Elkhart police for 'miscarriage of justice.'" (No. 20D03-0309-MR-155, Chronological Case Summary, June 19, 2018 entry). Royer filed a response to the State's motion. Following a hearing, the trial court judge in Royer's case, who is the post-conviction court judge in Tyson's case, issued an order that provides, in relevant part, as follows:

> 9.     Additionally, Slosar contends that he made no statements that violate Ind. Professional Conduct Rule 3.6, as only information contained in the public record was stated at the press conference, along with matters he has a constitutional right to say on behalf of Royer. The Court carefully reviewed the State's Motion, as well as Royer's Response, along with the various attachments referencing news articles about the conference. Particularly troubling to the Court were Slosar's statements at the subject press

conference characterizing "'systemic failure' and an 'epidemic' in Elkhart County where people are wrongfully convicted because of police corruption, uninspiring defense counsel and an overzealous prosecutor." Slosar went on to say that "these factors contributed to Andrew Royer being wrongfully convicted of a murder that he is absolutely innocent of." Slosar also stated that "we have proven that his conviction was an absolute fraud and the conviction was based on intentional misconduct." Additionally, videos of proposed witnesses were released and Slosar inaccurately referred to the pending Trial Rule 60(B) Motion filed in this Court as an "appeal."

10. The Indiana Supreme Court in *In re: Litz*[,] 721 N.E.2d 258 (Ind. 1999) addressed behavior such as [Slosar's] and held that Litz's publication of a letter in several local newspapers which state[d] his client committed no crime, criticized the prosecutor's decision to retry the case, and mentioned his client had passed a lie detector test constituted a violation of Ind. Professional Conduct Rule 3.6(a).[5]

11. In sum, Slosar's comments and statements are beyond the scope of the exceptions stated in Ind. Professional Conduct Rule 3.6(b) as to what a lawyer who is participating in litigation of a matter may state.[6] The statements are highly

---

[5] Indiana Rule of Professional Conduct 3.6(a) provides as follows:

A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

[6] Indiana Rule of Professional Conduct 3.6(b) provides as follows:

Notwithstanding paragraph (a), a lawyer may state:

(1)     the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved;
(2)     information contained in the public record;

inflammatory, defamatory, inaccurately state the law as it exists at this time with respect to Royer's conviction, and draw legal conclusions about matters not yet adjudicated. Slosar's actions go beyond simply summarizing evidence that is a matter of public record. Further, any alleged "new evidence" must be heard in accordance with the judicial process before any legal conclusions may be reached. Essentially, the extrajudicial statements made by Slosar at the public press conference, and which were reported in the media, do exactly what the Rule prohibits - forming public opinion that has a substantial likelihood of materially prejudicing the adjudicative proceedings pending in this Court.

* * * * *

13. Here, the Court finds that the statements Slosar made at the public press conference held on June 13, 2018, violated Ind. Rule of Professional Conduct 3.6(a) in that they were extrajudicial statements that Slosar knew or reasonably should have known would be disseminated by means of public communication and would have a substantial likelihood of prejudicing the adjudicative proceeding that is pending in this matter, specifically, his Trial Rule 60(B) Motion.

---

(3)  that an investigation of a matter is in progress;
(4)  the scheduling or result of any step in litigation;
(5)  a request for assistance in obtaining evidence and information necessary thereto;
(6)  a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and
(7)  in a criminal case, in addition to subparagraphs (1) through (6):
    (i)  identity, residence, occupation and family status of the accused;
    (ii)  if the accused has not been apprehended, information necessary to aid in apprehension of that person;
    (iii)  the fact, time and place of arrest; and
    (iv)  the identity of investigating and arresting officers or agencies and the length of the investigation.

14. While the Court clearly recognizes Slosar's First Amendment right to free expression, as noted by the Indiana Supreme Court in the Commentary to Ind. Professional Rule of Conduct 3.6,[7] that right must be balanced with the right to fair and impartial legal proceedings, which may entail some restriction of the information that may be disseminated about a party prior to and during those proceedings. Ind. Professional Rule of Conduct 3.6 does not curtail free speech except to the extent necessary to protect the corresponding right to fair proceedings. This is the basis upon [which] the Court is acting.

15. For all these reasons, Slosar is hereby enjoined from making extrajudicial commentary and statements to the extent explained in Ind. Professional Rule of Conduct 3.6 on the matter that is pending before this court. Failure to comply with this Order will be deemed willful failure to comply with Ind. Professional Conduct Rule 3.6 and is subject to appropriate sanctions.

---

[7] The commentary to Indiana Rule of Professional Conduct 3.6 provides, in relevant part, as follows:

It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression. Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence. On the other hand, there are vital societal interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a right to know about threats to its safety and measures aimed at assuring its security. It also has a legitimate interest in the conduct of judicial proceedings, particularly in matters of general public concern. Furthermore, the subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy.

(App. Vol. 3 at 56-59). Also, in the order, the trial court noted that Attorney Slosar had argued that Indiana Rule of Professional Conduct 3.6 had not applied to this case because no trial had been pending. The trial court responded that it disagreed with Attorney Slosar's over[-]simplification of the intent of the rule and found that "the clear and express language of paragraph (a) is that dissemination of extrajudicial statements that will have a likelihood of materially prejudicing **an adjudicative proceeding** (Emphasis added) is prohibited. Indeed, that language, as well as "legal proceedings" is used throughout the Rule, the Commentary, and in case law." (App. Vol. 3 at 56).

[10] In August 2018, Royer filed a motion to withdraw, without prejudice, his Trial Rule 60(B) motion, which the trial court granted. In May 2019, Royer filed a motion for permission to file a successive petition for post-conviction relief, which this Court granted. Royer then filed a successive petition for post-conviction relief and a motion for change of judge. The post-conviction court judge, who had issued the order finding that Attorney Slosar had violated Indiana Rule of Professional Conduct 3.6(a), granted Royer's motion for a change of judge.

[11] Royer's case was subsequently assigned to Kosciusko Superior Court Judge Joe V. Sutton ("Judge Sutton"), who held a four-day hearing on Royer's successive petition for post-conviction relief in October and November 2019. Following the hearing, Judge Sutton issued a fifty-five-page order granting Royer's successive petition for post-conviction relief and vacating Royer's murder conviction based on newly discovered evidence and *Brady* violations.

[12] Judge Sutton specifically found newly discovered evidence that Elkhart County Forensic Specialist Dennis Chapman ("Forensic Specialist Chapman") had not been qualified to conduct the latent fingerprint comparisons that he had made in Royer's case.[8] Judge Sutton noted that then-Elkhart County Chief Deputy Prosecutor Vicki Becker ("Deputy Prosecutor Becker")[9] had been responsible for meeting with Forensic Specialist Chapman and preparing him to testify. However, Judge Sutton found that Deputy Prosecutor Becker had not been provided with Forensic Specialist Chapman's resume and had not been told that he was not qualified to conduct comparisons of latent prints. Judge Sutton further found that Forensic Specialist Chapman had "misled [Deputy Prosecutor] Becker into believing that he was qualified to conduct the type of latent print comparisons that [had] exist[ed]" in the case. (App. Vol. 3 at 69). Judge Sutton also found a *Brady* violation because Forensic Specialist Chapman's lack of qualifications had not been disclosed to the defense.

[13] Judge Sutton further found newly discovered evidence that Detective Carl Conway ('Detective Conway"), the lead investigator in the Sailor homicide had been removed from the homicide unit before Royer's trial. The reason for Detective Conway's removal was a misrepresentation that he had made to an

---

[8] In 2012, the Elkhart County Sheriff's Department disciplined Forensic Specialist Chapman for his role in Royer's case. Forensic Specialist Champman retired in 2013.

[9] Vicki Becker is currently the elected Elkhart County Prosecutor.

attorney regarding one of the attorney's clients.[10] Based upon this misrepresentation, Detective Conway's supervisors had concerns about the impact that his misrepresentations would have on future homicide investigations and his credibility at trials if called to testify. However, Detective Conway's removal from the homicide unit had not been disclosed to Royer before trial. Judge Sutton further found a *Brady* violation because the Elkhart Police Department had not disclosed Detective Conway's removal to the defense.

[14]   In addition, Judge Sutton found newly discovered evidence that Detective Conway had threatened a critical witness in Royer's case and promised her $2,000 to falsely testify against Royer at trial. Judge Sutton further found that the witness' recantation of her trial testimony at the post-conviction hearing and her explanation for how her statement had been crafted were both credible. In addition, Judge Sutton found a *Brady* violation because the coercion of the witness and the fabrication of her testimony had not been disclosed to the defense.

---

[10] Judge Sutton further explained that Detective Conway's appeal of his removal from the homicide unit had been summarily denied. In addition, Detective Conway had later been removed from the sex-crimes unit. According to Judge Sutton, during that removal process, Detective Conway had "made a complaint to [Deputy Prosecutor Becker]. A disciplinary proceeding ensued that resulted in an agreement between [Detective] Conway and the Elkhart Police Department. As part of that agreement, the Elkhart Police Department agreed to withdraw any allegations alleging or suggesting that 'he caused the Office of the Prosecuting Attorney to lose faith in the Elkhart Police Department or to question its ability to supervise its detectives, investigate sex crimes or to perform any other form of police activities.' In exchange, Detective Conway accepted a written reprimand." (App. Vol. 3 at 83-84 n.7).

[15]     Judge Sutton further found newly discovered evidence that Royer's two audio-recorded statements obtained on September 3 and September 4, 2003, which totaled approximately sixty-one minutes, were unreliable and involuntary. Judge Sutton specifically noted that Detective Conway had interrogated Royer for approximately seven and one-half hours and that there was newly discovered evidence that Detective Conway had a reputation for obtaining confessions from every suspect that he had interrogated while assigned to the homicide unit. In addition, Judge Sutton found newly discovered evidence that Detective Conway's ability to obtain confessions had not been a direct result of his internal interrogation training at the Elkhart Police Department. Judge Sutton further found newly discovered evidence that the Elkhart Police Department had not provided Detective Conway with any meaningful training on how to conduct interrogations, including how to interrogate a suspect such as Royer, who suffered from a mental disability. Judge Sutton also found that although Detective Conway had been aware of Royer's mental disability, Detective Conway did not use any protections to safeguard against the possibility of Royer giving false and unreliable statements. Judge Sutton specifically pointed out that although another member of the homicide unit had told Detective Conway that the Elkhart Housing Authority had documentation revealing that Royer was severely disabled and had the mind of a child, Royer had not been permitted to have a lawyer, counselor, or family members present for his interrogations on September 3 and 4.

[16]     In addition, Judge Sutton found newly discovered evidence that Royer had not knowingly and voluntarily waived his *Miranda* rights because Detective Conway had not properly taken the time to advise Royer of these rights. Judge Sutton also found newly discovered evidence that Detective Conway had "repeatedly provided information about the homicide to Mr. Royer throughout the unrecorded two-day interrogation sessions." (App. Vol. 3 at 101). In addition, Judge Sutton found newly discovered evidence that although Detective Conway revealed at the successive post-conviction hearing that Royer's "mental well-being [had] broke[n] down[]" during the interrogations, Detective Conway had taken Royer's recorded statement and placed him under arrest. (App. Vol. 3 at 103). Royer had been "in such a state of confusion that Detective Conway had to remind him that he [had given] a confession and was under arrest." (App. Vol. 3 at 103).

[17]     Judge Sutton also found newly discovered evidence that the Elkhart Police Department's investigation into Royer's statements corroborated their unreliability. (App. Vol. 3 at 104). Specifically, Detective Conway acknowledged that he was only able to corroborate the following two basic pieces of information from all of Royer's statements: (1) Royer knew the other person who had been charged with killing Sailor; and (2) Royer lived in the same building as Sailor. Further, many of the details in Royer's recorded statements conflicted with the physical evidence.

[18]     Based on these extensive findings, including newly discovered evidence and *Brady* violations, Judge Sutton vacated Royer's murder conviction after

concluding that he was entitled to a new trial. We note that although Judge Sutton found several *Brady* violations, Judge Sutton's order does not specifically state that Deputy Prosecutor Becker or any other prosecutor had known about Detective Conway's misconduct or had purposely withheld evidence from the defense.[11]

[19]     On appeal, we affirmed Judge Sutton's grant of Royer's successive petition for post-conviction relief and vacation of Royer's murder conviction. *Royer*, 166 N.E.3d at 380. We specifically highlighted instances of Detective Conway's misconduct and concluded that Royer had not received a fair trial. Like Judge Sutton, we did not state that Deputy Prosecutor Becker or any other prosecutor had known about Detective Conway's misconduct or had purposely withheld evidence from the defense.

[20]     We now return to the facts in Tyson's appeal. In June 2021, Tyson filed a supplement to his motion for a change of judge, wherein he advised the post-conviction court that he had recently filed a 267-page petition for post-conviction relief on behalf of "another victim of the Elkhart epidemic[.]" (App. Vol. 3 at 207). The State subsequently filed a response to Tyson's initial motion for a change of judge. Also, in June 2021, the post-conviction court held a hearing on Tyson's motion for a change of judge. In September 2021, the post-

---

[11] "For *Brady* purposes, the prosecutor is charged with knowledge of information known by the police even if the prosecutor herself is unaware of the information." *Royer*, 166 N.E.3d at 400.

conviction court issued a ten-page order denying Tyson's motion for a change of judge. This order provides, in relevant part, as follows:

20. In the instant case, [Tyson's] conclusory allegation that this Court cannot be impartial in considering [his] post conviction allegations of police and prosecutorial misconduct simply because the presiding Judge worked as a Deputy Prosecutor over twenty (20) years ago does not support a finding of bias. The facts attendant to the instant case occurred in 2015, thirteen (13) years after the end of the presiding Judge's tenure as a Deputy Prosecutor. Moreover, even if this Judge may have once worked alongside current elected Prosecutor Vickie Becker is of no consequence. There is no evidence that any special, enduring or extrajudicial relationship exists between Ms. Becker and the Honorable Judge. Finally, [Tyson]'s contention that this Court's impartiality is questionable based on this Judges' theoretical relationships with law enforcement personnel in general twenty (20) years ago, does not taint the Court's ability to determine credibility. [Tyson]'s claim in this regard is not supported by any corroborative detail or examples, and is based purely on speculation.

21. [Tyson] also alleges that this Court's findings in the case of State v. Andrew Royer in Cause No. 20D03-0309-MR-0155, regarding the conduct of attorney Elliot Slosar, one of [Tyson]'s counsel, and the ultimate entry of an injunction against Mr. Slosar, calls into question the ability of the presiding Judge to remain unbiased and impartial in the instant case. Specifically, [Tyson] complains that because this Court previously found comments and allegations made by Mr. Slosar to be "defamatory," the Court formed opinions on the merits of Royer's case. Therefore, [Tyson] argues that this Judge is duly biased and unfit to preside over the current post conviction case

in which [Tyson] raises similar allegations. However, [Tyson] misstates the issue addressed by the Court in Royer by stating that the Court found that the allegations of "systemic" failure in Elkhart County leading to wrongful convictions were false; and, that Royer's counsel knowingly or recklessly made false statements about the causes of Royer's convictions. [Tyson] further averred that this Court reached these conclusions without hearing the testimony of a single witness or considering any evidence in the Royer case.

22. A review of the actual Order entered on July 3, 2018 clearly shows that [Tyson]'s characterization of the proceedings in Royer is wrong. That matter came on for hearing on the State's Motion for Emergency Hearing and Request for Injunction based on Mr. Slosar holding a press conference outside the Prosecutor's Office in downtown Elkhart, Indiana, during which Mr. Slosar made a number of comments and allegations about Royer's then pending Ind. Trial Rule 60(B) motion. Specifically, at the time the Court issued its July 3, 2018 Order, the statements made by Mr. Slosar to the press characterized "'systemic failure' and an 'epidemic' in Elkhart County where people are wrongfully convicted because of police corruption, uninspiring defense counsel and an overzealous prosecutor." Slosar went on to say that "these factors contributed to Andrew Royer being wrongfully convicted of murder that he is absolutely innocent of." Slosar also stated that "we have proven that his conviction was an absolute fraud based on intentional misconduct." The Court found Slosar's statements to be beyond the scope of the exceptions stated in Ind. Professional Conduct Rule 3.6(b), as well as inflammatory and defamatory as they inaccurately stated the law as it existed at that time with respect to Royer's conviction, and inappropriately drew legal conclusions about matters that had not yet been adjudicated. *(Court's July 3, 2018 Order).*

23. To the contrary, the Court carefully reviewed the Motion before it and Royer's Response, along with numerous attachments; therefore, the Court did consider evidence and testimony relevant to the Motion before it. Royer's 60(B) Motion was not before the Court; the State's Motion for an Emergency Injunction was. Royer's 60(B) Motion was pending, and as established by the case history in FN 1 above, nothing had been proven, and there was no ruling on the merits of that Motion; therefore, Mr. Slosar's statements to the public and media were blatantly inappropriate and false. In his Motion for Recusal, [Tyson] is attempting to frame the issues addressed in the Court's July 3, 2018 Order in the Royer case nearly three (3) years ago to serve his own purpose in the instant case. However, the facts surrounding the Court's finding and entry of an injunction in the Royer case are in no way present, relevant or even similar to the instant case and that argument is without merit.

24. [Tyson]'s attempts to cite Andrew Royer's subsequent successful post conviction action decided in 2021 as evidence that counsel's statements in 2018 were true and an absolute defense to the Judge's characterization of attorney Slosar's comments as defamatory also fail. Although [Tyson] is correct that Andrew Royer ultimately prevailed on his post conviction action, that fact was not established when this Court ruled in the 2018 injunction matter and that case has absolutely no bearing on the instant case. Relying on the Court's previous ruling as evidence of personal bias on the part of the presiding Judge is misplaced as doing so erroneously treats the Court's finding that counsel violated Ind. Rule of Professional Conduct 3.6(a) as pertaining to substantive issues in Royer's post conviction case. *Clearly, the Court's Order of July 3, 2018 does not support a rational inference of personal bias toward [Petitioner] Leon Tyson.* The injunction in the Royer case was issued on a very narrow set of

circumstances, and the impetus behind the Order was to prevent conclusions from being reached prematurely without a full adjudication on the evidence, to ensure the integrity of the litigation and to circumscribe maneuvers that might prejudice the pending adjudicative proceedings. It cannot be said that an objective person with knowledge of those circumstances would doubt the impartiality of the judge in the instant case.

25. Andrew Royer's success in his post conviction case also has no bearing on the instant case simply because [Tyson] is again claiming the same alleged "systemic failure." There is no factual connection between Royer and the instant case at all, let alone a connection warranting recusal of the presiding Judge. In fact, Royer's success on his individual post conviction petition does not unequivocally demonstrate the presence of what [Tyson] frames as "systemic" misconduct in Elkhart County. Rather, the Indiana Court of Appeals in State v. Royer, 166 N.E.3d 380 (Ind. Ct. App. 2021) addressed misconduct regarding the behaviors of one detective insofar as Royer's case. Id at 404, n. 20.

26. [Tyson] further suggests that simply because this Court ultimately recused in the post conviction case involving Andrew Royer, it must reach the same conclusion here. While the Court nonetheless did recuse itself from hearing Royer's post conviction case on the merits in order to cure any lingering concerns in that case, that ruling does not dictate how the Court must handle future post conviction cases, including this one.

* * * * *

28. For all the herein stated reasons, this Court concludes that [Tyson] has not met his burden of overcoming the

> presumption that this Judge is unbiased and unprejudiced
> with respect to [Tyson]'s pending post conviction
> proceeding.

(App. Vol. 4 at 6-11) (emphasis added).

[21] Three weeks later, Tyson filed a motion for reconsideration, wherein he argued that the post-conviction court's "appalling misreading of the *Royer* case show[ed] its inability to impartially consider [Tyson]'s claims[]" and that the post-conviction court's "claim that Royer ha[d] 'absolutely no bearing' on this case [was] baseless." (App. Vol. 4 at 16, 18). In October 2021, the post-conviction court denied Tyson's motion for reconsideration.

[22] In December 2021, the post-conviction court certified its order for interlocutory appeal. In its certification order, the post-conviction court stated as follows:

> As to [Tyson]'s allegation that the Orders he requests this Court
> to certify involve substantial questions of law, [Tyson] most
> disrespectfully avers that this Court has "ignored a clear
> obligation to recuse, misapplied the governing law, and failed to
> address several of Mr. Tyson's arguments." To the contrary, the
> Court's Order denying [Tyson's] Motion for Recusal is a very
> detailed ten (10) page Order in which the Court took great care to
> research and address each of [Tyson]'s arguments. The Court
> believes that it did appropriately apply well-settled law regarding
> recusal in determining that recusal in the instant case is not
> warranted. In this regard, it is the opinion of this Court that no
> substantial question of law exists.
>
> Notwithstanding the foregoing, the Court believes that
> substantial questions of law do exist as to the appropriateness of
> [Tyson] repeatedly raising and relying on matters outside this

case, whether [Tyson] has incorrectly interpreted and applied previous Orders issued by this Court in an unrelated case, and whether [Tyson] had drawn conclusions not based on evidence in this case in support of his position that this Court harbors bias and prejudice against him; and, therefore, is unable to render an impartial decision in his post conviction proceedings. With respect to these matters, the Court finds that early resolution would promote a more orderly disposition of the case and promote judicial economy and resources. While this appeal will by no means resolve the pending post-conviction litigation, it will resolve the important threshold issue of judicial recusal before the case proceeds on the merits.

(No. 20D03-1807-PC-37, Chronological Case Summary, December 27, 2021 entry). In February 2022, this Court accepted jurisdiction over Tyson's interlocutory appeal.

[23] One month later, in March 2022, Tyson filed in this Court a verified motion pursuant to Indiana Appellate Rule 37 to stay the appeal and remand the case to the post-conviction court. In his motion, Tyson claimed that he had newly discovered evidence, which revealed that the post-conviction court had been married from 1992 until 2003 to Stephen Cappelletti ("Cappelletti"), who had been an Elkhart Police Department reserve police officer from 1983 through 1994. Tyson advised this Court that he planned to file a renewed motion for a change of judge based on this newly discovered evidence. In April 2022, this Court granted Tyson's motion to stay and remand. In our order, we stated that "[w]ithin thirty-five (35) days of the date of this order, the [post-conviction] court is ordered to hold a hearing, if necessary" and issue a ruling on Tyson's

renewed motion for a change of judge. (No. 22A-PC-143, Chronological Case Summary, April 4, 2022 entry).

[24] In April 2022, Tyson filed, in the post-conviction court, a renewed motion for a change of judge pursuant to Indiana Post-Conviction Rule 1(4)(b). In his twenty-four-page motion, Tyson argued that this Court had "ordered [the post-conviction] court to reconsider its obligation to recuse in light of this new evidence." (App. Vol. 6 at 74). Tyson also argued that an evidentiary hearing was necessary [because] . . . [the post-conviction court]'s failure to disclose its marriage to Mr. Cappelletti raise[d] significant questions as to whether this [post-conviction] Court ha[d] failed to disclose other information relevant to recusal[.]" (App. Vol. 6 at 75). Tyson further argued that the post-conviction court had a "clear obligation" to disclose its prior marriage to Mr. Cappelletti to Mr. Tyson and that "[r]ecusal [was] necessary because [the post-conviction] Court's marriage to Mr. Cappelletti – and his involvement in police misconduct – place[d] this Court's orders in a far more disturbing light." (App. Vol. 6 at 90, 91).

[25] The State filed a reply to Tyson's renewed motion for a change of judge. The post-conviction court initially scheduled a May 2022 hearing for Tyson's renewed change of judge motion. However, at the end of April 2022, the post-conviction court entered an order denying Tyson's motion without a hearing. In this order, the post-conviction court explained that after having thoroughly reviewed the record in the case, the post-conviction court had determined that an evidentiary hearing was "not only unnecessary, but also was not mandated."

(No. 20D03-1807-PC-37, Chronological Case Summary, April 29, 2022 entry).

The post-conviction court specifically explained, in relevant part, as follows:

> The Court of Appeals directed this Court to **hold a hearing, if necessary, and issue a ruling on Appellant's Renewed Motion for Recusal.** (Emphasis added). Just as counsel for [Tyson] has previously and consistently drawn legal conclusions and misinterpreted this Court's orders, counsel once again 'puts words in the mouth' of the Indiana Court of Appeals that are not there, to-wit: [Tyson], by counsel informed this Court in his Renewed Motion that a hearing was necessary, which is not Tyson's call at all. Then, after the Court accommodated counsel by setting a one-hour hearing for relevant argument only in this case as well as in *Seabolt v. State*, Cause No. 20D03-2106-PC-000019, counsel informed the Court that the Indiana Court of Appeals meant to say in its Order . . . that an evidentiary hearing was mandated[.]
>
> The specifically stated purpose of the remand in this case was for this Court to consider and issue a ruling on [Tyson]'s Renewed Motion for Recusal, not to reconsider its prior rulings[.] Moreover, nowhere in the Court of Appeals Order remanding this cause is this Court directed to reconsider its 'obligation to recuse' as suggested by [Tyson]. The Court's ruling at this time is strictly limited to the alleged "newly discovered evidence" in [Tyson]'s Renewed Motion for Recusal. The Court's prior Order of September 8, 2021 denying [Tyson]'s Motion to Recuse and October 4, 2021 Order denying [Tyson]'s Motion to Reconsider are affirmed and incorporated in their entirety herein.

(No. 20D03-1807-PC-37, Chronological Case Summary, April 29, 2022 entry).

(emphasis in the original).

[26] Regarding the substance of Tyson's renewed recusal motion, the post-conviction court stated as follows:

In his Renewed Motion for Recusal, [Tyson] alleges that this Court must recuse in the pending post conviction case because the Judge was married to an Elkhart Police Department reserve officer, Stephen Cappelletti ("Cappelletti"), from June 6, 1992 through April 15, 2003, and that Cappelletti had close ties to a group of officers who framed [Tyson] and was involved in police misconduct similar to that alleged in [Tyson]'s Post Conviction Relief Petition. Cappelletti was with the Elkhart Police Department part time from 1983-1994; therefore, during most of that time, this Judge was not married to him. Also, any direct allegation of misconduct by Cappelletti as espoused by Tyson in his Renewed Motion allegedly occurred in 1989, prior to the marriage. Cappelletti did not work at the Elkhart Police Department at any time when an investigation would have ensued in [Tyson]'s case. Cappelletti's employment with the Elkhart Police Department ended in 1994. Tyson was charged with the offense of Murder on December 7, 2015, and was convicted on January 26, 2017. That Cappelletti was involved in any investigation of [Tyson]'s case between 1994 and 2003 and would have shared information with this Court about a murder that did not occur until June 20, 2015 is not only incredulous, but impossible. Moreover, this Judge had been divorced from Cappelletti for over twelve (12) years when [Tyson] was charged and had no contact with him thereafter. Further, to suggest that any of the activities or attitudes [Tyson] avers Cappelletti and/or his associates engaged in or believed somehow means that this Court must also condone such activities and harbor such beliefs based on the marriage many years earlier is entirely without merit. Even if Cappelletti remained friends with former Elkhart Police Officers, that does not implicate this Court. Contrary to [Tyson]'s contention, the Judge's former marriage does not provide "corroborative detail" that this Court cannot impartially assess the credibility of witnesses who may be associated with police officers in general and their alleged misconduct. Moreover, [Tyson] has failed to demonstrate how this Court's ex-husband bears any nexus to [Tyson]'s post-conviction matter. Other than a shared employment status many years ago with

individuals accused of wrongdoing who may or may not testify in this case, there is no connection at all. [Tyson] has not shown that this Judge was witness to or adheres to anything that would compr[om]ise his post conviction case[.]

In the instant case, there is no evidence that this Court's former marriage to an Elkhart Police Department reserve officer in any way ever swayed the Judge's decision making or does so today nineteen (19) years post-divorce. Cappelletti stopped working for the Elkhart Police Department in 1994, twenty-one (21) years prior to [Tyson]'s offense. It is unlikely that Cappelletti himself obtained any information about [Tyson]'s case, let alone imparted such knowledge to this Court. This Judge has no knowledge derived from extrajudicial sources stemming from her marital relationship with Cappelletti about [Tyson]'s case that could demonstrate personal prejudice or bias against [Tyson] in this post conviction proceeding. [Tyson] has failed to draw any valid connection between his case, Cappelletti and this Court other than self serving commentary that Cappelletti may be a critical witness to a pattern and practice of alleged police misconduct at the Elkhart Police Department. [Tyson], however, has not articulated any meaningful argument as to how Cappelletti, a reserve Elkhart Police Department officer until 1994, constitutes a critical witness to [Tyson]'s 2017 conviction. [Tyson] makes a final claim that this Court had an obligation to disclose her past marriage to Cappelletti under Rule 2.11 Code of Judicial Conduct, n.5. Honestly, why it would cross the mind of the Court to disclose that she was once married to a man who served as a reserve Elkhart Police Department officer for approximately two (2) years while they were married and whom the Court divorced some nineteen (19) years ago is wholly untenable. This was not information that this Judge should be expected to believe the parties or their lawyers might reasonably consider relevant to a motion for disqualification. [Tyson]'s argument in this regard is not persuasive and recusal is not required.

(No. 20D03-1807-PC-37, Chronological Case Summary, April 29, 2022 entry). Based on the foregoing, the post-conviction court denied Tyson's renewed motion for a change of judge. In May 2022, Tyson filed a motion for reconsideration, which the post-conviction court denied.

Also in May 2022, Tyson filed in this Court a status report regarding the change of judge proceedings before the post-conviction court, wherein Tyson advised this Court that he intended to proceed with his interlocutory appeal. Tyson also asked this Court to consolidate his case with *Iris Seabolt v. State*, No. 22A-PC-00208 and *Pink Robinson v. State*, No.20C01-2012-PC-00041. Tyson argued that this Court should consolidate the cases "due to a significant overlap in factual and legal issues." (No. 22A-PC-143, Chronological Case Summary, May 17, 2022 entry). This Court's motions panel granted Tyson's motion to consolidate the three cases, which, as explained above, we have de-consolidated.

Tyson now appeals the denial of his motion for a change of judge in his post-conviction case.

## Decision

Tyson argues that the post-conviction court clearly erred when it denied his motion for a change of judge. We disagree.

At the outset, we note that the law is well-settled that "adjudication by an impartial tribunal is one of the fundamental requirements of due process imposed on the courts of this state by the Fourteenth Amendment to the federal constitution." *Matthews v. State*, 64 N.E.3d 1250, 1253 (Ind. Ct. App. 2016)

(citing *Tumey v. Ohio*, 273 U.S. 510, 535 (1927)), *trans. denied*. Judges are presumed impartial and unbiased. *Matthews*, 64 N.E.3d at 1253. "'[T]he law will not suppose a possibility of bias or favor in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.'" *Matthews*, 64 N.E.3d at 1253 (quoting 3 William Blackstone, *Commentaries* \*361)).

[31]  In post-conviction cases, parties seeking to overcome the presumption of judicial impartiality must move for a change of judge under Post-Conviction Rule 1(4)(b). That rule provides, in relevant part, as follows:

> Within ten (10) days of filing a petition for post-conviction relief under this rule, the petitioner may request a change of judge by filing an affidavit that the judge has a personal bias or prejudice *against the petitioner*. The petitioner's affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. A change of judge shall be granted if the historical facts cited in the affidavit support a rational inference of bias or prejudice.

(Emphasis added).

[32]  This rule requires the judge to examine the affidavit, treat the historical facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice. *Pruitt v. State*, 903 N.E.2d 899, 939 (Ind. 2009). A change of judge is neither automatic nor discretionary but calls for a legal determination by the post-conviction court. *Id*. We presume that the post-

conviction court is not biased against a party and disqualification is not required under the rule unless the judge holds a "personal bias or prejudice." *Id.* (quoting P.-C.R. 1(4)(b)). Typically, a bias is personal if it stems from an extrajudicial source, which means a source separate from the evidence and argument presented at the proceedings. *Pruitt*, 903 N.E.2d at 939. "Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before [her]." *L.G. v. S.L.*, 88 N.E.3d 1069, 1073 (Ind. 2018).

[33] "Further, Indiana courts credit judges with the ability to remain objective notwithstanding their having been exposed to information which might tend to prejudice lay persons." *Id.* In addition, "[a] showing of prejudice sufficient to support a motion for a change of judge must be established from personal, individual attacks on a defendant's character, or otherwise." *Miller v. State*, 106 N.E.3d 1067, 1076 (Ind. Ct. App. 2018), *trans. denied.* Stated differently, "a motion for a change of judge should be granted only if the evidence reveals such a high degree of favoritism or antagonism as to make a fair judgment impossible." *State v. Shackleford*, 922 N.E.2d 702, 707 (Ind. Ct. App. 2010) (cleaned up), *trans. denied.*

[34] The ruling on a motion for change of judge is reviewed under the clearly erroneous standard. *Garland v. State*, 788 N.E.2d 425, 433 (Ind. 2003). Reversal will require a showing which leaves us with a definite and firm conviction that a mistake has been made. *Id.*

[35]   We restate Tyson's first argument as whether the post-conviction court clearly erred in denying his motion for change of judge because the post-conviction court's 2018 order in the unrelated Royer case finding that Attorney Slosar had violated Rule of Professional Conduct 3.6(a) supports a rational inference of bias or prejudice against Tyson.[12] "Prior judicial rulings generally do not support a rational inference of prejudice." *Voss v. State*, 856 N.E.2d 1211, 1217 (Ind. 2006). "Adverse rulings and findings by a trial judge from past proceedings with respect to a particular party are generally not sufficient reasons to believe the judge has a personal bias or prejudice." *Id*. Although the mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing, there may be circumstances in which a rational inference of bias or prejudice may be established if a judge's order is sufficiently egregious. *Id*.

[36]   Here, however, we find nothing egregious in the July 2018 order that the trial court judge, who is the post-conviction court judge in Tyson's case, issued in

---

[12] We note that Tyson asserts that in *Royer*, 166 N.E.3d at 380, this Court found systemic police and prosecutorial misconduct in Elkhart. We did not. Specifically, we find no language in our opinion in *Royer* to support such an interpretation. Rather, our review of our opinion in *Royer* reveals that the newly discovered evidence related primarily to the horrific conduct of one Elkhart Police Department detective.

Tyson also asserts that in its July 2018 order in the Royer case, the post-conviction court found that there was no systemic police or prosecutorial misconduct in Elkhart. It did not. The post-conviction court's order in the Royer case solely addressed the statements that Attorney Slosar made at a press conference after he had filed in Royer's case a motion for relief from judgment pursuant to Indiana Trial Rule 60(B). Specifically, the post-conviction court found that Attorney Slosar's statements violated Rule of Professional Conduct 3.6(a) because Attorney Slosar knew or reasonably should have known that these statements would be disseminated by means of public communication and would have a substantial likelihood of prejudicing the adjudicative proceeding that was pending in the matter.

the unrelated Royer case. Rather, the trial court simply concluded that Attorney Slosar's press conference statements regarding systemic police misconduct in Elkhart, which he had made before the adjudication of Royer's Trial Rule 60(B) motion, violated Rule of Professional Conduct 3.6(a). Further, and more importantly, the trial court's July 2018 order does not mention Tyson or anything about Tyson's case, which occurred ten years after Royer's case. In sum, we find nothing in the Royer order that supports a rational inference of bias or prejudice *against Tyson*.[13]

[37] We restate Tyson's second argument as whether the post-conviction court clearly erred in denying Tyson's motion for a change of judge because the post-conviction court's 1998-2002 tenure as a deputy prosecutor supports a rational inference of bias or prejudice against Tyson. In *Calvert v. State*, 498 N.E.2d 105, 107 (Ind. Ct. App. 1986), this Court concluded "that a trial judge must disqualify [her]self from a proceeding in which [s]he has actively served as an attorney for one of the parties regardless of whether actual bias or prejudice exists." Here, there is no allegation that the post-conviction court judge actively

---

[13] We further note that Tyson's argument that the post-conviction court should have granted his motion for a change of judge because it granted the motion for a change of judge in the Royer case is unavailing. Specifically, the fact that the post-conviction court granted a motion for a change of judge in Royer's case "appears to us to evidence the fact that [the post-conviction court judge] would conduct herself as an unbiased jurist in applying the law to the particular facts of a case." *Smith v. State*, 613 N.E.2d 412, 414 (Ind. 1993) (affirming the trial court's denial of a motion for a change of judge where the petitioner argued that the adverse publicity that the post-conviction court received as a result of granting an unrelated petition for post-conviction relief would cause the post-conviction court to be biased against granting post-conviction relief in petitioner's case), *cert. denied*.

served as a deputy prosecutor on Tyson's case. Indeed, this would have been an impossibility because the post-conviction court judge left the prosecutor's office in 2002, thirteen years before the State charged Tyson with murder in 2015 and twenty-one years before Tyson's upcoming hearing on his post-conviction petition. Given the remoteness in time of the post-conviction court's tenure in the Elkhart County Prosecutor's Office in relation to the charges against Tyson and his upcoming post-conviction hearing, Tyson has failed to show the post-conviction court's 1998-2002 tenure as a deputy prosecutor supports a rational inference of bias or prejudice *against Tyson*. *See Bloomington Magazine, Inc. v. Kiang*, 961 N.E.2d 61, 66 (Ind. Ct. App. 2012) (explaining that the proximity in time of the historical facts alleged in the affidavit to the matter concerning the motion for a change of judge is a relevant inquiry).

[38] Lastly, we restate Tyson's third argument as whether the post-conviction court clearly erred in denying Tyson's motion for a change of judge because the post-conviction court judge's 1992-2003 marriage to Cappelletti supports a rational inference of bias or prejudice against Tyson. We note that the post-conviction court judge's marriage to Cappelletti ended ten years before the State charged Tyson with murder and twenty years before Cappelletti's potential testimony in Tyson's post-conviction case. Tyson's affidavit does not allege that any relationship existed between Cappelletti and the post-conviction court judge after their marriage had been dissolved. Indeed, in her order denying Tyson's motion for a change of judge, the post-conviction court judge specifically noted that she had not had contact with Cappelletti since their marriage had been

dissolved in 2003. Given the remoteness in time of the post-conviction court judge's marriage to Cappelletti to the charges against Tyson and his upcoming post-conviction hearing, Tyson has failed to show that this prior marriage supports a rational inference of bias or prejudice *against Tyson*. *See Bloomington Magazine*, 961 N.E. 2d at 66. *See also McKinney v. State*, 873 N.E.2d 630, 640 (Ind. Ct. App. 2007) (explaining that where the personal relationship between the trial court judge and her former employee, who was the murder victim's mother, had ended twenty years before the defendant's trial and the defendant had not alleged any facts suggesting that any relationship existed between the two after that employment had been terminated, the trial court did not clearly err in denying defendant's motion for a change of judge), *trans. denied*.

## Conclusion

[39] In sum, the recited historical facts on which Tyson based his motion for a change of judge simply do not support a rational inference of bias or prejudice against Tyson as contemplated by Post-Conviction Rule 1(4)(b). We further note that the post-conviction court has neither expressed an opinion on the merits of Tyson's case nor attacked his character. Accordingly, because we are not left with a definite and firm conviction that a mistake has been made, we conclude that the post-conviction court did not clearly err in denying Tyson's motion for a change of judge. *See Garland*, 788 N.E.2d at 433. We, therefore, affirm the post-conviction court's denial of Tyson's motion. *See Pruitt*, 903 N.E.2d at 939 (explaining that where Pruitt's post-conviction court judge was the same judge who had presided over his trial and where Pruitt's affidavit in

support of his motion for a change of judge had shown no historical facts that had demonstrated personal bias on the part of the post-conviction court judge, Pruitt had been provided with a full and fair post-conviction relief hearing before an impartial judge).

[40] Affirmed.

Crone, J., and Bradford, J., concur.